ALLIED INTERNATIONAL AMERICAN EAGLE TRADING CORP.,
Plaintiff-Appellee,

v.

S.S. "YANG MING," her engines, boilers, etc.

v.

YANG MING MARINE TRANSPORT CORPORATION,
Defendant-Appellant.

No. 348, Docket 81–7484.

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1981.

Decided Feb. 11, 1982.

Rehearing and Rehearing In Banc Denied April 9, 1982.

 

Paul M. Keane, New York City (Joseph F. DeMay, Jr., Cichanowicz & Callan, New York City, on the brief), for defendant-appellant.

Alexander Peltz, New York City (Dwyer, Peltz & Walker, New York City, on the brief), for plaintiff-appellee.

Before MOORE and NEWMAN, Circuit Judges, and TENNEY, District Judge *.

TENNEY, District Judge:

This appeal calls into question the package liability limitation imposed by section 4(5) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(5). The defendant, Yang Ming Marine Transport Corporation ("Yang Ming"), a Taiwanese company, is the owner and operator of the S.S. Yang Ming, on which was shipped a cargo of screws, bolts, nuts, studs, and washers, to be delivered to its purchaser, the plaintiff Allied International American Eagle Trading Corporation ("Allied"). The cargo was never delivered, for which the defendant concedes liability, but the parties disagree on the proper damage limitation. The missing goods were packed on two pallets, one holding nine cartons, the other holding ten drums of cargo. The defendant contends that the pallets should be considered "packages" within the meaning of the statutory $500 limitation, while the plaintiff argues that each carton and drum should be considered a "package." After a one-day bench trial, the district court made findings of fact and conclusions of law in the plaintiff's favor. Accordingly, the defendant was held liable for the loss of 19 packages, which were valued at $8500. We reverse and hold that, under the circumstances of this case, the two pallets should be considered "packages" under the statute, thus subjecting the defendant to a maximum liability of $1000.

In this case, under the heading "No. of Containers or P'kgs.," the bill of lading listed eighteen pallets, two cases, and ten drums, with a total listed as "30 Packages." Under the heading "Description of Packages and Goods," there is a parenthetical listing of the number of cartons, cases and drums on each pallet, as well as the point of origin and a general legend reading "Screws, Bolts, Nuts, Studs." Below all of this information, a printed line requires the parties to fill in the "Total Number of Packages or Units (in words)," after which is typed "Thirty (30) Packages Only." In the opinion below, the court considered the parenthetical descriptions to come under the heading "No. of Containers or P'kgs." We disagree,[1] but even if they had, we are

---

* Honorable Charles H. Tenney, Senior District Judge of the Southern District of New York, sitting by designation.

1. The ambiguity as to the column in which the parenthetical descriptions appear may have re-

convinced that the case is controlled by the explicit statements in the bill of lading that the total number of packages was thirty. In order to reach a total of thirty, one must count the pallets as "packages."[2]

Although we find this case to be governed by a straight-forward contract analysis, it may be helpful for us to review the legal history of "the troublesome conundrum: When is a package not a package?" *Mitsubishi Int'l Corp. v. S.S. Palmetto State,* 311 F.2d 382, 383 (2d Cir. 1962), *cert. denied,* 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963). The statute turns on the meaning of "package," but nowhere defines the term. Because of the capaciousness of the word, we are left with an overabundance of candidates for informing the standard, "package."[3] Black's Law Dictionary defines "package" as "[a] bundle put up for transportation or commercial handling; a thing in form to become, as such, an article of merchandise or delivery from hand to hand.... As ordinarily understood in the commercial world, it means a shipping package." This definition confirms our intuition about what a package is, but it does little to establish a satisfying legal standard. First, we must discount the phrase, "from hand to hand," for "Paul Bunyan himself would have had difficulty

in delivering three 32½ ton crates 'hand to hand.'" *Mitsubishi Int'l Corp. v. S.S. Palmetto State, supra,* 311 F.2d at 383. But more generally, Black's does not explain how to set liability when a carton on a pallet is loaded onto a container ship—a bundle within a bundle within a bundle, each "put up for transportation or commercial handling." The qualification, "[a]s ordinarily understood in the commercial world," adds a note of common sense, but once the cargo is lost, one finds that the only thing ordinary is that a dispute about how to interpret the package limitation will ensue. And despite the number and length of this court's opinions on the subject, we still find pockets of legitimate disagreement, presenting appealable issues, in an area where Congress intended to foster certainty and security in the shipping business. *Cameco, Inc. v. S.S. American Legion,* 514 F.2d 1291, 1297 (2d Cir. 1974).

Starting with the dictionary, "a source of interpretation not to be wholly disregarded although by no means controlling," *Nichimen Co. v. M. V. Farland,* 462 F.2d 319, 334 (2d Cir. 1972), this court has derived a working definition of the term, "package," as "a class of cargo, irrespective of size, shape or weight, to which some packaging prepara-

sulted from the narrow dimensions of the columns. The parenthetical descriptions physically appear under the second column headed "Description of Packages and Goods," but the use of parentheses might indicate that the parenthetical descriptions were intended to be an additional entry supplementing the information listed in the first column headed "No. of Containers or P'kgs." and not physically appearing in that column only because the entry was written in a single horizontal line. Of course, if that was the intention, the entry could have been written entirely within the first column, using two or three lines for each entry. In any event, there is no ambiguity at all concerning the appearance of the total of "Thirty (30) Packages only" on the separate line captioned "Total Number of Packages or Units (in words)."

2. Other facts of this case will be discussed, where pertinent, in connection with the applicable legal standards.

3. Section 4(5) of COGSA provides, in part: Neither the carrier nor the ship shall in any event be or become liable for any loss or

damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

This case is not concerned with the phrase, "customary freight unit," there being no dispute that either the pallets or the cartons and drums should be considered "packages."

tion for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Aluminios Pozuelo Ltd. v. S.S. Navigator*, 407 F.2d 152, 155 (2d Cir. 1968). Beyond the common sense application of the term, "package," the liability limitation must be interpreted in light of section 4(5)'s dual purposes: to limit liability, but to "[make] null and void any agreement reducing the carrier's liability below that level." *Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 814 (2d Cir. 1981) (footnote omitted). "No doubt the drafters had in mind a unit that would be fairly uniform and predictable in size, and one that would provide a common sense standard so that the parties could easily ascertain at the time of contract when additional coverage was needed, place the risk of additional loss upon one or the other, and thus avoid the pains of litigation." *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft*, 375 F.2d 943, 945 (2d Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967) (footnote omitted) [hereinafter *"Standard Electrica"*]. In short, COGSA sought to remedy the inadequate coverage often found in carriers' adhesion contracts, while establishing a contractual setting which would "ensure uniformity in the basic rights and responsibilities arising out of bills of lading." *Mitsui & Co. v. American Export Lines, Inc., supra*, 636 F.2d at 815.

Many decisions through the years have considered whether large pieces of cargo should be deemed "packages" because of wrappings, boards, or skids attached to them to facilitate transportation and/or to protect them during shipping. The results of these cases varied. *See, e.g., Hartford Fire Ins. Co. v. Pacific Far East Line, Inc.*, 491 F.2d 960, 965 (9th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974) ("Any distinction based upon the subjective purpose for which the skid was attached should not be the test for resolving the issue. . . . To hold that somehow a 'package' evolved from the mere attachment of the machine to a wooden skid seems a highly unreasonable result."); *Aluminios Pozue-*

*lo Ltd. v. S.S. Navigator, supra*, 407 F.2d at 155 (three-ton toggle press, bolted to a skid and described as "ONE (1)" package in the bill of lading, held to be a "package"); and cases collected therein. Generally, "regardless of size, where cargo is fully crated or boxed, reported cases have held that the items are 'packages' within the meaning of COGSA. . . . Difficulties have arisen only in the few cases where the items shipped are partially packaged, and the cases have gone both ways." *Aluminios Pozuelo Ltd. v. S.S. Navigator, supra*, 407 F.2d at 155 (collecting cases). In this case, neither side disputes that the cargo was packaged; the issue is whether the cartons or the pallets should be considered "packages." The machinery cases are pertinent insofar as they indicate that the parties' expressed agreement is an important, if not controlling, factor.

The use of containers to ship goods created another area of contention. Containers are very large, oblong metal boxes, resembling trucks without wheels or cabs. Indeed, "[i]n some instances an entire trailer may be uncoupled from its tractor-truck on the pier and placed aboard the carrier." *Standard Electrica, supra*, 375 F.2d at 945. Naturally, carriers and their insurers attempted to turn this technological advance into a financial one too, by arguing that containers are "packages" for which shippers can recover only $500. The courts, however, rejected this attempt, holding that they could not "escape the belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that 'package' is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, *functionally a part of the ship*, in which the carrier caused them to be 'contained,'" *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971) (footnote omitted) (emphasis supplied). Expanding upon the distinct characteristics of containerization, this court has written:

The container revolution added a new dimension to the problem. See generally Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 JML&C 203 (1970). In contrast to the wooden pallets in *Standard Electrica,* which were 39″ in length, 33″ in width and 42″ in height and carried only six cartons each, containers are large metal boxes resembling truck trailers save for the absence of wheels, roughly 8′ high, 8′ wide and with lengths up to 40′, see Simon, The Law of Shipping Containers, 5 JML&C 507, 510 (1974), capable of carrying hundreds of packages in the normal sense of that term. Unlike the pallets in *Standard Electrica,* which were provided by the shipper, containers are typically supplied by the carrier, must be returned to the carrier by the consignee, and are used and reused hundreds of times. Many ships, including the S.S. Red Jacket, are so constructed that shipments must be made in containers. The shipper normally pays for the weight of the pallet but not for that of the container.... The Supreme Court has observed, in a different but not unrelated context, that "the container is a modern substitute for the hold of the vessel." *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 270, 97 S.Ct. 2348, 2360, 53 L.Ed.2d 320 (1977).

*Mitsui & Co. v. American Export Lines, Inc., supra,* 636 F.2d at 816.

After the decision in *Leather's Best, Inc. v. S.S. Mormaclynx, supra,* this circuit began to pursue a "functional economics test," which dictated that where the shipper's units are functional as packages, the container is presumptively not a package unless the carrier proves otherwise. *Cameco, Inc. v. S.S. American Legion, supra; Royal Typewriter Co. v. M/V Kulmerland,* 483 F.2d 645 (2d Cir. 1973). In *Mitsui & Co. v. American Export Lines, Inc., supra,* however, this court firmly retreated from the "functional economics test," noting that "[t]his opinion [abandoning the *Kulmerland* analysis] was circulated to all active judges of the Court prior to filing." 636 F.2d at 821 n.*. Instead, the court reaffirmed its holding in *Leather's Best, Inc. v. S.S. Mormaclynx, supra:* "at least when what would ordinarily be considered packages are shipped in a container supplied by the carrier and the number of such units is disclosed in the shipping documents, each of those units and not the container constitutes the 'package.'" *Mitsui & Co. v. American Export Lines, Inc., supra,* 636 F.2d at 817. The rationale for this rule is that the "functional economics test" would force the parties to guess about their COGSA status and therefore would cause shippers to "incur the wasteful expense of supplying packaging unnecessary for container shipment simply to avoid having the container deemed the package." *Id.* at 818.

The opinion in *Leather's Best, Inc. v. S.S. Mormaclynx, supra,* left unanswered "what the result would be if [the shipper] had packed the [cargo] in a container already on its premises and the bill of lading had given no information with respect to the number of [units]." 451 F.2d at 815. In *Leather's Best,* the bill of lading indicated the "Number and kind of packages" to be "1 container s.t.c. [said to contain] 99 bales of leather." 451 F.2d at 804. (A bale consisted of a carton 4′ by 2′ by 1½′ with steel straps around it.) Given the contractual descriptions of the cargo, and the fact that the carrier supplied the container and had an employee observe its loading, the court held that each bale constituted a package. The opinion, however, admitted "the possibility that there might be some instances where a container might be the package, e.g., when the shipping documents, like those in *Standard Electrica,* gave the carrier no information as to the contents." *Mitsui & Co. v. American Export Lines, Inc. supra,* 636 F.2d at 817.

In those cases which made use of "the possibility that ... a container might be a package," a departure from the general rule was justified by one or more of several factors: the contractual terms in the bill of lading, the lack of notice of the container's contents, and/or the absence of another unit to consider a package. For example, in *Rosenbruch v. American Export Isbrandts-*

en Lines, Inc., 543 F.2d 967 (2d Cir.), cert. denied, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976), the court found "about as clear a [case] as we have seen for holding that the container constituted a package for the purposes of Section 4(5) of COGSA." Id. at 970. There, the shipper stated on the bill of lading that the "No. Of Cont. Or Other Pkgs." was "1" and described the cargo as "used household goods," representations which were considered "of particular importance." Id. at 969 n.3. In addition, the goods were not separately packed or labelled, and, "absent a container, would not have been shipped in separate packages. They would have been shipped in a large wooden crate or container approximating the size of the metal container that was actually used." Id. at 970. Furthermore, despite the discussion of the "functional economics test" in Royal Typewriter Co. v. M/V Kulmerland, supra, the outcome of that case is fully consistent with Leather's Best, Inc. v. S.S. Mormaclynx, supra, and with Rosenbruch v. American Export Isbrandtsen Lines, Inc., supra. In Kulmerland, under the heading "Number and kind of packages; description of goods," the bill of lading represented each of three containers as " '1 Container said to contain Machinery,' without any reference to the number of cartons of adding machines or to the fact that the 'Machinery' consisted of adding machines." 483 F.2d at 646.

Since Leather's Best Inc. v. S.S. Mormaclynx, supra, the cases holding that containers were not "packages" have turned on the parties' contractual understanding, the appropriateness of the· shipping units within the container as "packages," and the carrier's awareness of those commercially ordinary units. In Cameco, Inc. v. S.S. American Legion, supra, for instance, the court held that 270 cartons and four pallets should be considered the "packages," rather than the container in which they were shipped. Under the heading, "Number and Kind of Packages—Description of Goods," the bill of lading said "-1- container said to contain:" and then listed the number of cartons and pallets, specifying the number of tins and weights contained in each pack-

age. 514 F.2d at 1293 & n.1. The court concluded from the representations on the bill of lading that the parties intended to view the cartons and pallets as packages. Id. at 1299.

More recently, in Mitsui & Co. v. American Export Lines, Inc., supra, two plaintiffs sought damages for cargo damaged or washed overboard during a storm. One plaintiff lost five containers holding 1834 tin ingots, the other thirteen containers holding 1705 rolls of floor covering. Regarding the floor covering, the court held that the individual rolls had been packages within the meaning of COGSA and that the shipper "had done everything possible in the bills of lading to put [the carrier] on notice that it considered it was shipping rolls ... and not just loaded containers." 636 F.2d at 821. Regarding the ingots, the court held that the stacks of goods inside the containers did not constitute packages (or "bundles," as they were dubbed). Ordinarily, this finding would have required the court to apply the $500 liability limit to "customary freight units," see note 2 supra, which would have yielded a higher damage limitation than application of the $500 limit to each of the bundles. The court concluded, however, that the plaintiff-shipper was estopped from using this higher damage limitation, because "[t]he typewritten material in the bill of lading ... represented that the contents of the containers consisted of 'bundles' of ingots," and the carrier could not have known that this representation was false. Id. at 823. Thus, the plaintiff was held to a limit of $500 for each of the bundles indicated in the bill of lading. Id.

In its opinion below, the district court relied heavily on Mitsui & Co. v. American Export Lines, Inc., supra, in ruling that Allied's cartons and drums—and not the pallets on which they were loaded—should be considered "packages." The court wrote: "As a result of Mitsui, it appears that where the contents of a shipment, packed on pallets provided by the shipper, were fully disclosed in the bill of lading, the $500 COGSA limitation would apply to the identifiable and identified individual units,

not the pallets." Relying on this ruling, the appellee argues as follows: if the carrier's lack of notice of the contents of a container warrants treating the container as a single "package" for purposes of the liability limitation, then notice of its contents automatically makes the carrier liable for each "package" within the container, and by extension, notice of the contents of a pallet makes the carrier liable for each "package" on the pallet.

There are two problems with this analysis. First, the bill of lading expresses a contractual relationship, in which the intent of the parties is the overarching standard. *See, e.g., Mitsui & Co. v. American Export Lines, Inc., supra,* 636 F.2d at 816; *Cameco, Inc. v. S.S. American Legion, supra,* 514 F.2d at 1297 ("The thrust of our cases has been to seek to arrive at the parties' intent and to search for some degree of certainty and predictability"); *Standard Electrica, supra,* 375 F.2d at 946. In this contractual setting the word "package" has great importance as a term of art because of its use in section 4(5) of COGSA. *Aluminios Pozuelo Ltd. v. S.S. Navigator, supra,* 407 F.2d at 156. Second, the container cases involve factors not found in pallet cases. Because of their size and their function in the shipping industry, containers are ordinarily not considered "packages." But when the bill of lading expressly refers to the container as one package, or when the parties fail to specify an alternative measure of the "packages" shipped, the courts have no choice but to respect their express or implied understanding and to treat the container as a single package. In such a situation, the carrier's lack of notice of the container's contents indicates that the parties agreed upon no meaning for "package" oth-

er than the container as a whole. At base, however, the court must examine the parties' contractual arrangement.

In this circuit, *Mitsui & Co. v. American Export Lines, Inc., supra,* did not replace contract analysis with notice analysis, and the opinion in *Standard Electrica, supra,* is still the law with regard to pallets. In *Standard Electrica,* the court found that "[t]he dock receipt, the bill of lading, and libellant's claim letter all indicated that the parties regarded each pallet as a package." 375 F.2d at 946. The appellee argues that *Standard Electrica* is distinguishable because the bill of lading there did not give the carrier any notice of the contents of the pallets, Appellee's Brief at 9, a fact pointed out in the opinion below, Joint Appendix ("App.") at 9. The decision in *Standard Electrica,* however, did not mandate that notice of the contents of a pallet would increase the carrier's liability. When the court wrote, "the number of inner cartons is not apt to be mentioned in any of the shipping documents," it should not be understood to have implied that mere mention is enough to alter the contractually agreed upon number of "packages." In *Standard Electrica,* where the contents of the pallets were physically observable, we ruled that visual notice is not enough: "it would seem immaterial that the number of individual cartons within each pallet might have been visible to the workmen on the pier." 375 F.2d at 946. We now rule that written notice of the number of containers on a pallet, even in the bill of lading, is not binding on the carrier if, elsewhere in the bill of lading, the parties express agreement upon a number of "packages" which counts only the pallets.[4]

---

4. The appellee Allied asserts that this court should follow the reasoning expressed in *Allied International American Eagle Trading Corp. v. S.S. "Export Bay",* 468 F.Supp. 1233 (S.D.N.Y. 1979), a case "involving the same plaintiff, the same cargo, the same loss, the same issue, the same defense argument and the same result." Appellee's Brief at 8–9. We disagree with that case, however, at least insofar as it placed primary importance on mere notice to the carrier in determining the package limitation. Nonetheless, the result in that case may have

been consistent with our opinion here. In "*Export Bay*", the court wrote that the bill of lading described the cargo as "3 pallets (27 kegs) 4 kegs 9 drums, for a total of 16 packages," 468 F.Supp. at 1234, but it is unclear whether the document or the district court provided the total figure. Depending upon the phrasing of the bill of lading, it may have been that the parties agreed to consider the 27 kegs as packages. But without the documents before us, we cannot judge, and we will not express an opinion on the package limitation if

The appellee raised several other arguments in opposition to a reversal in this case. We will deal with them separately. First, Allied states that "[t]he rotten egg in appellant's basket . . . is the fact that certain of the cases and drums were listed by the carrier as the package as well," and thus argues that Yang Ming asks the court to take the "uncommon sense approach" of "applying the package limitation to a carton, in one instance, and in the other to a pallet containing the very same type of carton." Appellee's Brief at 10–11. While this inconsistent terminology may pose a problem of logic, it presents no legal problem where we are seeking to discover the parties' contractual agreement. In addition, the case of *Cameco, Inc. v. S. S. American Legion, supra*, provides a precedent for considering some pallets and some cartons as "packages." There, the bill of lading listed 500 tins of ham, as well as four pallets each holding 100 tins of ham. 514 F.2d at 1293 n.1.

Second, the appellee is concerned, as was the court below, that Yang Ming should not be allowed to avoid financial responsibility commensurate with the plaintiff's loss. The district court opinion states that its "conclusion is consistent with the overall Congressional policy of insuring that the carrier is subject to a reasonable, minimum level of liability for loss or damage sufficient to induce it to take precautions to protect the cargo." App. at 10. *See also Standard Electrica, supra*, 375 F.2d at 947–48 (Feinberg, J., dissenting). This is a concern shared by this court. Just last year, we wrote that "the carrier's duties would be meaningless if their violation entailed no significant liability. In interpreting § 4(5), courts must therefore take a critical look at any proposed construction of that section that would reduce a carrier's liability below reasonable limits." *Mitsui & Co. v. American Export Lines, Inc., supra*, 636 F.2d at 815. But this caveat does not warrant ignoring the parties' stated agreement. As

we wrote in *Standard Electrica, supra*, when "we are not faced with a case where the parties have attempted to define the word package by their agreement in a manner that might be repugnant to the Act, . . . we think such characterizations are entitled to considerable weight in that the parties each had the same understanding as to what constitutes a 'package.' " 375 F.2d at 946. In *Mitsui & Co. v. American Export Lines, Inc., supra*, as in other container cases, the courts must look askance at an agreement which purports to define a container as a "package" because the results of such a limitation can be ludicrous. For example, in *Mitsui & Co.*, the plaintiffs asserted that they had shipped 1834 and 1705 packages for limitations of $917,000 and $852,500, respectively, while the defendant asserted that they had shipped five and thirteen container-packages for limitations of $2500 and $6500, respectively.[5] But even in such a case, the courts will respect a contract which defines containers as "packages" if that is the parties' understanding. In this case, the bill of lading clearly counts each pallet as one package in totaling up the cargo. Because a pallet may appropriately be considered a "package," *Standard Electrica, supra*, 375 F.2d at 946, the agreement will be enforced according to its terms.

Third, the parties disagree strenuously about who prepared the bill of lading. The court below found that the defendant-appellant Yang Ming prepared the bill of lading. App. at 10. Yang Ming, however, argues that "[t]here is absolutely no testimony or evidence" to support this conclusion, Appellant's Brief at 4, and at oral argument in this court, the appellant's counsel stated that he could prove that the shipper had prepared the bill of lading. Appellant also asserts that "the inference that the issuer of the bill of lading was . . . the party that prepared it is unfounded in light of commercial shipping practice," Ap-

---

the parties write, for example, "3 pallets (27 kegs)" under the heading of "number of packages" without providing a total anywhere on the bill of lading.

5. The actual claim was for $357,946.19, but the higher figure of $852,500 would have been the maximum allowable under the statutory limitation.

pellant's Reply Brief at 2, about which the appellee states: "appellant offered no proof whatsoever on what is or is not a customary commercial fact." Appellee's Brief at 6. To the contrary, the appellee appears to rely on the fact that "the bill of lading . . . was executed by appellant's agent," *id.*, to show that Yang Ming prepared it.

On this point, the court is more influenced by the terms of the bill of lading than by the fact that Yang Ming's agent executed the document or by the fact that the carrier's agent may have entered the pertinent information on the contract. Above the description of the goods, the bill of lading states "Particulars furnished by Shipper," and below the description, the bill carries a stamp which reads: "Shipper's Load and count, cargo covered by this Bill of Lading has been Unitized by the Shipper and Shipper has arranged for the Consignee and/or Receiver to take delivery of this shipment on the same pallets received from the Shipper by the Carrier." This representation accords with the findings below that "defendant carrier received from shipper, Associated Lumber & Trading Company, Ltd., . . . the cargo [which] was packed by the shipper primarily on pallets." App. at 4–5. In addition, a printed paragraph atop the bill of lading declares: "In accepting this Bill of Lading, the merchant agrees to be bound by all the stipulations, exceptions, terms and conditions on the face and back hereof, whether written, typed, stamped or printed, *as if signed by the merchant.*" (Emphasis supplied.) All of these statements and agreements lead us to conclude that plaintiff-appellee Allied must be bound by the information on the bill of lading even if Yang Ming's agent actually typed in the total number of packages as thirty.

Fourth, the appellee Allied suggests that the pallets were not considered packages because "the appellant did not charge freight for the weight of the pallets . . . and the freight rate was discounted because of the shipper's use of the pallets." Appellee's Brief at 12. As authority, the appellee mentions *Mitsui & Co. v. American Export Lines, Inc., supra,* and *Leather's Best, Inc. v. S.S. Mormaclynx, supra.* In *Mitsui &*

*Co.,* the court stated that "[t]he shipper normally pays for the weight of the pallet but not for that of the container," a fact which supported the conclusion that a container is functionally part of the ship. 636 F.2d at 816. In *Leather's Best,* the court noted the shipper's 10% discount for using a container, but then pointed out that "there is nothing to show that the carrier did not realize corresponding economic advantages [from] the container method of shipment; to the contrary, the district court was of the view that containers are 'primarily for the convenience of the carrier.'" 451 F.2d at 815–16 n.19. On the other hand, consolidation of shipments into larger units also serves the shipper's interests by facilitating handling and ensuring the safety of the goods. *Cameco, Inc. v. S.S. American Legion, supra,* 514 F.2d at 1299. In short, who chose to use the pallets is less important than how the parties agreed to view those pallets for purposes of the liability limitation.

■ Fifth, the appellee argues that the 1968 Brussels Protocol, referred to in *Mitsui & Co. v. American Export Lines, Inc., supra,* reinforces its position that each carton or drum should be considered a package. The Protocol states that "[w]here a container, pallet or similar 'article of transport' is used to consolidate goods, the number of packages or units enumerated in the bill of lading as packed in such articles of transport shall be deemed to be the number of packages or units; if, on the other hand, the bill of lading does not show how many separate packages there are, then each 'article of transport' shall be deemed a package or unit." *Id.,* 636 F.2d at 821. In *Mitsui & Co.,* the court found the Protocol to "reinforce the conclusion suggested by the language and purposes of COGSA," *id.* at 820. The Protocol, however, does not replace COGSA and does not supplant contract analysis with notice analysis. Even though the contents of the pallets in this case were "enumerated" in the bill of lading, the cases and drums were not individually counted in arriving at the agreed upon total number of "packages," as represented in several places on the bill of lading.

In most of our cases dealing with the liability limitation under section 4(5) of COGSA, we have bemoaned the increasing inadequacy of the statutory language when measured against the dramatic changes in shipping and transportation since the statute was originally enacted. *See, e.g., Mitsui & Co. v. American Export Lines, Inc.,* supra, 636 F.2d at 820; *Cameco, Inc. v. S.S. American Legion,* supra, 514 F.2d at 1297, 1300; *Leather's Best, Inc. v. S.S. Mormaclynx,* supra, 451 F.2d at 814–15 & n.18. In those same cases, however, we have consistently deferred to Congress's prerogative in designing—and redesigning—statutory standards, and we have therefore refused to rewrite or modernize COGSA's language to take into account developments in shipping since 1934. Accordingly, until there is a legislative revision of the $500 package limitation, the parties must abide by the contracts expressed in the bill of lading, and the shippers and their consignees must negotiate with the carriers if they wish to increase the number of packages to be covered by the liability limitation.

Reversed.