**ORIENT OVERSEAS CONTAINER LINE, (UK) LTD., Plaintiff,**

v.

**SEA–LAND SERVICE, INC., and M/V Sealand Quality, her engines, boilers, tackle, etc. in rem, Defendants.**

**No. 98 Civ. 1732(CSH).**

United States District Court, S.D. New York.

Nov. 28, 2000.

Tisdale & Lennon, LLC, New York City, for Plaintiff, Patrick F. Lennon, of counsel.

De Orchis, Walker & Corsa, LLP., New York City, for Defendant Sea–Land Service, Inc., M.E. De Orchis, John A. Orzel, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

For decades American admiralty courts have struggled to define the deceptively simple noun "package" within the context of § 4(5) of the Carriage of Goods by Sea act, 46 U.S.C.App. § 1304(5) ("COGSA" or the "Act"), which limits an ocean carrier's liability for cargo damage or loss to "$500 per package ...", or in case of goods not shipped in packages, per customary freight unit," unless the cargo skipper declares a higher value and pays a higher freight. "Freight" in this context refers not to the cargo, but the amount the carrier charges for the cargo's transportation.

This case, before the Court on stipulated facts and cross-motions for partial summary judgment, shows that the struggle to define "packages" continues.

## I. BACKGROUND

The following account is derived from the Stipulation of Facts ("SF") entered into by the parties.

At the pertinent times plaintiff Orient Overseas Container Lines (UK) Ltd., ("OOCL") and defendant Sea–Land Service, Inc. ("Sea–Land") were parties to a Space Charter and Sailing Agreement (the "Agreement"). OOCL and Sea–Land were both ocean common carriers. The Agreement enabled OOCL to provide its services upon vessels owned or operated by Sea–Land, for carriage of cargoes between certain United States and North European ports. One of the vessels Sea–Land owned or operated was the M/V SEALAND QUALITY.

As its corporate name indicates, OOCL conducted its business by arranging for the ocean carriage of goods stowed in containers. "Containers are very large, oblong metal boxes, resembling trucks without wheels or cabs." *Allied International American Eagle Trading Corp. v. S.S. Yang Ming,* 672 F.2d 1055, 1058 (2d Cir. 1982).

In January 1994, pursuant to the Agreement, OOCL chartered space aboard the M/V SEALAND QUALITY for the carriage of 1,768 Ford automobile engines from Rotterdam to the port of New York. The engines were not covered by any wrapping and were not boxed or crated. They were stowed on racks designed to accommodate 8 engines each. The racks were then stowed in 17 containers, 13 racks in each container. Thus each container contained 104 engines (8 engines times 13 racks), thereby accommodating the shipment of 1,768 engines (104 engines times 17 containers).

The racks were the property of the shipper of the engines, Ford Werke A.G., which placed the engines on the racks. The racks were not integral parts of the OOCL containers in which the engines were stowed.

The entire shipment of 1,768 engines was covered by a single ocean bill of lading, number 00LW37502149, which OOCL issued with Sea–Land's consent to the shipper of the engines, Ford Werke A.G. OOCL and Sea–Land were both ocean carriers, and thus became jointly and severally responsible for performance of the contract of carriage created by the bill of lading.

The bill of lading recited that on January 17, 1994, the 1,768 engines were laden on board the M/V SEALAND QUALITY at the port of Rotterdam, to be discharged at the port of New York for ultimate delivery to the consignee, Ford Motor Compa-

ny, at St. Paul, Minnesota. I will refer to the two Ford corporations involved collectively as "Ford."

As is customary in the trade, the bill of lading was comprised of a printed form with spaces in which the details of the shipment were typed. A printed clause incorporated by reference the limitations upon the carrier's liability found in § 4(5) of COGSA. Since the carriage was to a United States port, COGSA would in any event have applied *ex proprio vigore*. Another printed clause in the bill of lading extended its COGSA-derived defenses and limitations to the carriers' subcontractors, including stevedores and cargo handlers at the discharge port.

The face of the bill of lading contained a printed caption reading "PARTICULARS FURNISHED BY SHIPPER." Five columns were collected under that caption, each with a printed sub-caption, reading from left to right as follows:

> "CNTR. NOS. W/SEAL NOS. MARKS AND NUMBERS"
> "QUANTITY PACKAGES"
> "DESCRIPTION OF PACKAGES AND GOODS"
> "GROSS WEIGHT"
> "MEASUREMENT"

Typed details were filled in under each of these five printed sub-captions, as follows:

Under the printed sub-caption "CNTR.NOS W/SEAL NOS. MARKS AND NUMBERS" appears the typed notation "N/M." Presumably this is an abbreviation for "No Marks."

Under the printed sub-caption "QUANTITY PACKAGES" appears the typed notation "1768 PCS." Presumably "PCS" is an abbreviation for "pieces."

Under the printed sub-caption "DESCRIPTION OF PACKAGES AND GOODS" appear the following typed notations:

> "S.T.C.
> AUTOMOBILE ENGINES

> GASOLINE FOR NEW VEHICLES
> PACKED INTO 17 × 40′ CONTAINER"

Presumably the initials "S.T.C." stand for "SAID TO CONTAIN." Under the practice of the industry, that phrase indicates that the ocean carrier has not had an opportunity to examine the goods that have been stowed in a container. While these typed notations in the bill of lading refer to "CONTAINER" in the singular, the shipment was in fact stowed in 17 containers.

Under the printed sub-caption "GROSS WEIGHT," the typed notation "348578KG" appears opposite the notation "S.T.C." in the left adjoining column, and the typed notation "768475LB" appears opposite the notation "AUTOMOBILE ENGINES" in the left adjoining column.

There are no typed notations under the printed sub-caption "MEASUREMENT."

Directly underneath the notations that I have quoted, and running the entire width of the page, is a typed broken line, which I will illustrate thus: "_____."

Directly underneath that broken line, and stretching across the three left-hand columns, appears the typed notation:

> "TOTAL: * * *1768* * * PACKAGES."

Opposite that notation, in the right adjoining column with the printed sub-caption "GROSS WEIGHT," the same typed figures are repeated: "348578KG" and "768475LB."

Below those typed notations the following typed notations appear, beginning at the left-hand margin of the bill of lading and extending partially across the first three columns:

> "SHIPPERS LOAD STOW AND COUNT.
> FREIGHT COLLECT
> SHIPPED ON BOARD
> SPIT WITH 37590110 AND 37590111"

The first three lines are self-explanatory. I do not know what the phrase beginning with "SPIT" means. The SF does not discuss the phrase. It would not appear to be material to the dispute.

These typed notations are immediately followed by a list of 17 numbers. The bill of lading does not say so specifically, but the SF makes it plain that these are the numbers of the 17 containers into which the Ford engines were stowed. Under the printed sub-caption "DESCRIPTION OF PACKAGES AND GOODS," the typed notation "104 PCS." appears next to each container number.

The typed shipper's particulars in the bill of lading are devoid of any reference to the racks upon which the engines were placed before Ford stowed the racks in the containers. Neither OOCL nor Sea–Land were advised that the engines were shipped on racks.

The bill of lading contains two pertinent references to "freight." First, immediately following the typed list of container numbers, the bill of lading has a printed "NOTICE" in smaller but legible letters that "by virtue or [sic] incorporation of" COGSA, the Carrier's liability is limited "to a maximum of U.S. 500 per package or customary freight unit," unless "the Merchant declares a higher cargo value below and pays the Carrier's ad valorem freight charge." The bill of lading provides a blank space for "the Merchant" (that is, Ford as the shipper) to fill in a "Declared Cargo Value U.S. $ _____," and goes on to say: "If Merchant enters a value, Carrier's limitation of liability shall not apply and the ad valorem rate will be charged." Ford did not declare a higher cargo value. It left that space blank.

Second, the bill of lading contains detailed notations with respect to the manner in which the freight was calculated. These notations appear in columns under the captions "CODE—TARIFF ITEM," "FREIGHTED AS," "RATE," and "COLLECT." Seven separate charges are identified by code numbers or letters in the first column. The first notation under the "FREIGHTED AS" caption is "17/40'," which I take to be a reference to 17 40–foot containers. With respect to the monetary amounts of the separate charges, six of the seven amounts are multiples of 17; e.g., the rate for "THC FOR DIS" is $500 and the corresponding figure under the "COLLECT" caption is $8500, the result of multiplying $500 by 17. The only exception to the 17–multiple calculation is the prepaid charge of $597.24 for "FWDR COMMIS," which for some unrevealed reason is based upon a rate of $28.44 multiplied by 21, not 17.

On or about January 28, 1994, the SEA-LAND QUALITY arrived at Port Elizabeth, New Jersey, where the 17 containers carried under the bill of lading were discharged from the vessel to the Sea–Land Terminal. While Sea–Land personnel were moving one of the containers, bearing number OOL4110106, within the Terminal, the container was overturned, resulting in the total loss of the 104 engines it contained.

Ford claimed damages against OOCL. OOCL settled the claim by paying Ford the amount of $52,000. OOCL calculated that amount by treating each of the 104 engines as a "package" for COGSA purposes. The $52,000 payment results from applying the statutory $500 per package limitation to each of the engines (104 engines × $500 = $52,000).

OOCL then commenced this action to recover full indemnity from Sea–Land. Sea–Land resists that claim on the ground that OOCL, improperly regarding each of the 104 engines as a COGSA package, paid Ford more than the statute required OOCL to pay.

On these cross-motions for partial summary judgment, OOCL contends that its payment to Ford was appropriate because each engine constituted a package for COGSA purposes.

Sea–Land's positions seems to have changed during the briefing. Its main

brief contends at 10 that since "the individual Ford engines are not COGSA 'packages,' the applicable package limitation should be calculated with reference to the 'customary freight unit.'" Sea–Land did not suggest in that brief that the container itself should be viewed as a COGSA package. However, Sea–Land's sur-reply brief concludes at 8 that "[t]he container is the COGSA 'package,'" going on to argue that "[e]ven if the container was not treated as the COGSA 'package,' the 'customary freight unit' of the engines was lump sum, so the result would be the same: $500." *Id.* As an alternative to a $500 COGSA limitation, however derived, Sea–Land contends that "the applicable package limitation should be based upon the thirteen shipper owned racks, upon which the engines were placed, inside the container," main brief at 14, a formula that would result in a COGSA limitation of liability to $6,500.

OOCL's summary judgment motion is not limited to the issue of the applicable COGSA limitation. OOCL also asks that the Court hold Sea–Land liable for the damage to the engines in the overturned container, and adjudge Sea–Land liable to indemnify OOCL for the latter's settlement payment to Ford. But Sea–Land says in its main brief at 3 that it "opposes OOCL's motion for summary judgment as it relates to the issue of liability because issues of fact remain as to the cause of the accident and the responsibility of the settlement." The meaning of the last phrase is obscure, but it is plain enough that Sea–Land does not concede its fault for the loss, and the stipulation of facts is not broad enough to foreclose that issue, with which Sea–Land's obligation to indemnify OOCL is inextricably intertwined. Accordingly this opinion addresses only the dispute concerning COGSA's limitation of liability.

## II. DISCUSSION

The application of COGSA's limitation to the loss in this case is appropriate for partial summary judgment. The question is entirely one of law arising from undisputed facts.

§ 4(5) of COGSA provides:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ..., or in case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted on the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier."

"By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

. . . ."

COGSA does not define the crucial nouns that lie at the heart of § 4(5); nor does the legislative history furnish any assistance. "Unfortunately, no definition of 'package' or 'customary freight unit' is included in the statute. Due to the absence of any guides either in the statute or in the legislative history as to these terms, the decisions reveal little consistency." *Aluminios Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152, 154 (2d Cir.1968). "In determining the meaning of 'package,' we are without the aid of meaningful legislative history." *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiffahrts–Gesellschaft,* 375 F.2d 943, 945 (2d Cir.1967). Congress enacted COGSA in 1936. "No doubt the drafters had in mind a unit that would be fairly uniform and predictable in size, and one that would provide a common sense standard so that the parties could easily ascertain at the

time of contract when additional coverage was needed, place the risk of additional loss upon one or the other, and thus avoid the pains of litigation." *Standard Electrica*, 375 F.2d at 945. In *Aluminios*, 407 F.2d at 154, the Second Circuit sought guidance in *Black's Law Dictionary*, which defines "package" as a "bundle put up for transportation or commercial handling; a thing in form to become, as such, an article of merchandise or delivery from hand to hand," denoting "a thing in form suitable for transportation or handling." (quoting the 1951 edition of *Black's*). The Court of Appeals added in that 1968 opinion that "[a]s ordinarily understood in the commercial world, [package] means a shipping package or unit." *Id.*

If it was the COGSA drafters' purpose to "avoid the pains of litigation," they must be rolling in their graves. Myriad courts have struggled with what a COGSA "package" is. The struggle continues; *vide* the case at bar. One cannot wholly blame the COGSA drafters; " '[f]ew, if any, in 1936 could have foreseen the change in the optimum size of shipping units that has arisen as the result of technological advances in the transportation industry." *Standard Electrica*, 375 F.2d at 945. The *Standard Electrica* court, writing in 1967, was grappling with the relatively modest "technological advance" of placing six cardboard cartons on a single pallet; but Chief Judge Lumbard noted in a prescient footnote that "[l]arge container ships and trailer ships are being built to accommodate such special cargo" as "an entire trailer ... uncoupled from its tractor-truck on the pier and placed aboard the carrier." *Id.* n. 4.

The use to which present day containers are put exceeds the limited vision articulated in *Standard Electrica*. "The container revolution" has produced shipping devices "capable of carrying hundreds of packages in the normal sense of that term," *Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 816 (2d Cir.1981), and in fact many "normal" packages are routinely "stuffed" into a single container (to use the industry's inelegant terminology). Many ships "are so constructed that shipments must be made in containers." *Mitsui*, 636 F.2d at 816.

As Judge Friendly observed in *Mitsui*, 636 F.2d at 816, "[i]t did not take long for the carriers (or their P. and I. insurers) to realize that if they could persuade the courts to consider a container rather than smaller units stowed inside to be the 'package' for purposes of § 4(5) of COGSA," they would save a good deal of money. That effort has had limited success in the Second Circuit. While in non-container cases the Second Circuit has "generally deferred to the parties' intent, as manifested by their bill of lading, in determining what unit is the relevant COGSA package, ... in container cases we must take a critical look at clauses purporting to define the container as the COGSA package. Accordingly, we have consistently cast a jaundiced eye upon language purporting to embody such an agreement." *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 641 (2d Cir.1991).

The more recent Second Circuit cases hold that "if the bill of lading lists the container as a package and fails to describe objects that can reasonably be understood from the description as being packages, the container must be deemed a COGSA package." *Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam*, 759 F.2d 1006, 1015 (2d Cir.1985). In contrast, "when a bill of lading discloses on its face what is inside the container, and those contents may reasonably be considered COGSA packages, then the container is not the COGSA package." *Monica Textile Corp.*, 952 F.2d at 639. Whether cargo can reasonably be considered a package depends upon whether it is the result of "some packaging preparation for transportation ... which facilitates handling, but does not necessarily conceal or completely enclose the goods." *Aluminios*, 407 F.2d at 155.

In the case at bar, OOCL contends that the bill of lading's disclosure of what is inside the container precludes the container from being considered a COGSA package. Specifically, OOCL points to the references in the bill of lading to "1768 pcs." and " \*\*\*1768 \*\*\* packages" which were typed under the printed caption "QUANTITY PACKAGES," references that the bill of lading also discloses refer to "automobile engines." That language in the bill of lading mandates, OOCL contends, not only that the container cannot be a COGSA package, but also that each of the 1768 engines must be regarded as a COGSA package. OOCL based its settlement payment to Ford upon that proposition.

OOCL stresses that under Second Circuit case law, when courts undertake to decide whether a particular object should be deemed a COGSA package "the touchstone of our analysis should be the contractual agreement between the parties, as set forth in the bill of lading." *Binladen,* 759 F.2d at 1012. *See also Seguros Illimani S.A. v. M/V POPI P,* 929 F.2d 89, 94 (2d Cir.1991) ("A resolution of the shippers' claim presents primarily the question of whether the bill of lading, construed as a contract, reveals the parties' agreement on the appropriate COGA 'package.' "). OOCL contends that because the bill of lading at bar referred at one point to "1768 packages," OOCL and Sea–Land as ocean carriers were contractually bound to regard each of the 1768 engines as a COGSA package.

While OOCL's contention may have a seductive simplicity, it does not square entirely with the law of this circuit. The court of appeals said in *Nichimen Company, Inc. v. M.V. Farland,* 462 F.2d 319, 335 (2d Cir.1972), that "[w]hile the description on the bill of lading is not controlling, *Middle East Agency, Inc. v. The John B. Waterman,* 86 F.Supp. 487, 491 (S.D.N.Y. 1949), it is important evidence of the parties' understanding." In *Middle East Agency,* the district court decision that the *Nichimen* court cited for the proposition that the bill of lading description of the cargo "is not controlling," the bill of lading covering a shipment of eleven uncrated tractors referred to the tractors as "pieces or packages" and as "units." The tractors having been damaged in transit, the carrier relied upon those descriptive words in an effort to limit its liability to $500 per tractor. Judge Leibell, refusing to give the bill of lading's reference to "packages" decisive effect, and awarding damages on the more remunerative basis of freight units, reasoned as follows:

> In the bill of lading the tractors are referred as to "pieces or packages" and as "units". Admittedly they were uncased and uncrated, and were shipped without any covering whatsoever. But even if the words "pieces" and "units" did not appear in the bill of lading and if only the printed word "packages" appeared, I would not hold that the use of the printed word "package" at the top of a column would make the uncased and uncrated tractor a "package" in fact. An uncrated tractor should not be considered as if it were described as crated. I do not believe that the use of the printed word "package" on this bill of lading should be construed as a "stipulation" of the parties that the tractors were packages under the Act.

86 F.Supp. at 491 (footnote omitted).[1]

The district court's focus in *Middle East Agency* upon the physical characteristics of the cargo, rather than the words used in the bill of lading to describe it, resonates in the container context because "when a bill of lading discloses on its face what is inside the container, *and those contents may reasonably be considered COGSA packages,* then the container is not the COGSA package." *Monica Textile Corp.,* 952 F.2d at 639 (emphasis added). To

---

1. The version of this opinion available on Westlaw omits a portion from the middle of the passage quoted in text, which I have taken from that old-fashioned artifact known as a "book."

determine whether particular objects "may reasonably be considered COGSA packages," guidance may be derived from non-container cases, which also hold that the form of a bill of lading's wording cannot be exalted over the substance of the cargo. That latter proposition is illustrated by *Seguros,* 929 F.2d at 95, which contains an analysis more recent than that contained in *Middle East Agency* but entirely consistent with it:

> We therefore agree with the shippers that the numbers in the "NO. OF PKGS." column reflect the parties' understanding as to the number of packages, and we would apply those numbers in determining the aggregate COGSA per-package limitation *if the item to which the numbers referred could fairly be considered a "package."* However, the numbers reflect the quantity of individual tin ingots, and an ingot is not a COGSA package. By itself, it is not sufficiently wrapped, bundled or tied to be a COGSA package.... *If the number reflected in the "NO. OF PKGS." column referred to an item or a collection of items that qualified as a COGSA "package,"* we would readily hold the parties to that number in applying the per-package limitation. *Since the number refers to an item that is not a package,* we will accept, as the next best indication of the parties' intent, the numbers reflected on the bills of lading that do refer to *something that qualifies as a "package,"* and in this case, that is the number of bundles.

(emphasis added; citations and internal quotation marks omitted).

Thus the case at bar does not turn upon the reference in the bill of lading to the engines as "packages"; rather, it turns upon whether the engines qualified as COGSA packages, without regard to their description in the bill of lading. In *Aluminios,* 407 F.2d at 155, the Second Circuit summarized the characteristics that qualify an object as a COGSA package:

> Where goods are shipped without any packaging preparation, such items are not "packages" as specified in Section 4(5).... The meaning of "package" which has evolved from the cases can therefore be said to define a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods.

Viewed in the light of these authorities, I conclude without difficulty that the Ford automobile engines do not qualify as COGSA packages. The parties have stipulated that "[t]he engines were not covered by any wrapping and were not boxed or crated." SF ¶ 16. There was in fact packaging preparation for the ocean carriage of the engines; but that preparation consisted of placing each engine "on a rack designed to accommodate 8 of the engines. Thus, each container shipped under the Bill of Lading number OOLU37502149 contained 104 engines stowed upon 13 racks. The racks were the property of the shipper [Ford] and were not part of the OOCL container. The engines were placed on the racks by the shipper." SF ¶ 14. It is clear enough that if the bill of lading had disclosed that engines were stowed on racks, each rack would have counted as a COGSA package; *see Allied International American Eagle Trading Corp. v. S.S. Yang Ming,* 672 F.2d 1055, 1057 (2d Cir.1982) (where cartons and drums of cargo were packed on pallets, the pallets constituted the COGSA packages; "the case is controlled by the explicit statements in the bill of lading that the total number of packages was thirty. In order to reach a total of thirty, one must count the pallets as 'packages.'"). But the bill of lading at bar "is devoid of any reference to the 13 racks and neither OOCL nor Sea-Land were advised that the engines were shipped on racks." SF ¶ 15. Accordingly the placement of engines on racks is not relevant to the COGSA calculus.

Perhaps sensing stormy seas ahead, counsel for OOCL have gone *dehors* the SF and submitted an affidavit of Richard Allen, a marine surveyor who surveyed the damaged engines on OOCL's behalf at the Sea–Land terminal. Allen's affidavit says at ¶¶ 4–6:

> [t]he damaged Ford engines were removed from the ocean container by means of a fork lift utilizing hooks attached to the engines via lifting eyes located on the top front of each engine. The lifting eye used to remove the engines from the container, which I believe is attached to the top front of each engine during the manufacturing process, is designed to facilitate handling of the engines during the shipment process.
>
> In my experience, the lifting eyes attached to the engines are used to facilitate the handling of engines during the loading and unloading of the engines on the racks upon which they are stowed in the ocean container.

I do not think that these lifting eyes, which apparently form a permanent part of the engines as the result of the "manufacturing process," are relevant for COGSA purposes. It is of course useful for heavy automobile engines to come equipped with appendages which facilitate picking them up and putting them down again, since they accomplish nothing by just sitting on the ground or a shelf somewhere. But the relevant question in the COGSA context is whether these lifting devices may reasonably be regarded as preparation for *ocean* transportation, and Allen's affidavit falls well short of establishing that proposition. As noted, the preparation for ocean transportation performed in this case consisted of securing eight engines onto each of the thirteen racks which were then loaded into each of the containers covered by the bill of lading.[2]

Since the engines do not qualify as COGSA packages and Ford did not disclose the existence of the racks on the bill of lading, it follows that the Court has no choice but to regard the container as the COGSA package. I have previously quoted the Second Circuit's holding in *Binladen*, 759 F.2d at 1015, that "if the bill of lading lists the container as a package and fails to disclose objects that can reasonably be understood from the description as being packages, the container must be deemed a COGSA package." Arguably the present bill of lading "lists the container as a package," since under the printed caption "DESCRIPTION OF PACKAGES AND GOODS" there appears the typed notations "S.T.C. AUTOMOBILE ENGINES GASOLINE FOR NEW ENGINES *PACKED INTO 17 × 40' CONTAINER*" (emphasis added). "Packed" is the past tense of the verb "pack," which has the same root as the noun "package"; accordingly one need not stretch the language unduly to conclude that the bill of lading lists the container as a package. But that reading is not essential to the result I reach. If the bill of lading cannot be read to list the container as a package,

---

**2.** Sea–Land's sur-reply brief says at 2 that, according to Allen's survey report, the engines "were stowed on reusable racks or frames" and secured to the racks by "a clip pin assembly arrangement." The Allen survey report is not part of the record on these motions, but Sea–Land's quotations from it are not challenged, and they clarify the manner in which the racks were used to prepare the engines for loading into the container for the ocean carriage.

Sea–Land makes the further argument in its brief at 2–3 that since the container was not an "open top" device but had a roof, "the engines could not have been loaded into the container by a *derrick* using the lifting eyes." Sea–Land seemingly misreads the Allen affidavit, which describes the removal of the engines from the container "by means of a *fork lift*." A fork lift is a little vehicle with a fork-like front appendage which, I will assume, could fit inside a container to do its work. But the point need not be further pursued. Sea–Land plausibly asserts, and without contradiction, that "[a]uto engines normally are equipped with lifting rings or eyes of some sort for use at the factory and by repair garages." Sur-reply brief at 1. For the reasons stated in text, such devices have no significance in COGSA package analysis.

then *nothing* described on the bill of lading qualifies as a COGSA package; the engines do not qualify, and the racks are not mentioned. In those circumstances, the container must be regarded as the COGSA package by operation of law. The Second Circuit made that plain in *Yang Ming*, 672 F.2d at 1061:

> But when the bill of lading expressly refers to the container as one package, *or when the parties fail to specify an alternative measure of the "packages" shipped,* the courts have no choice but to respect their express or implied understanding and to treat the container as a single package. In such a situation, the carrier's lack of notice of the container's contents indicates that the parties agreed upon no meaning for "package" other than the container as a whole. (emphasis added).

If the bill of lading in the case at bar does not fall within the first of these two scenarios, it surely falls within the second, since the "engines" referred to in the bill of lading cannot conceivably qualify as COGSA packages, and the carriers were not bound by the contract to characterize them as such.

For the foregoing reasons, I conclude that the container was the COGSA carriage in this case, so that the Act limited the carriers' liability to Ford for the damaged engines to $500. It follows that $500 also provides the limitation upon any obligation Sea–Land might bear to indemnify OOCL in respect of OOCL's settlement payment to Ford. Given COGSA's limitation on its liability, OCCL's payment to Ford in excess of $500 was voluntary in law. Such payment cannot form the basis of an involuntary indemnification by Sea–Land.

If, contrary to this conclusion, the container cannot in law be regarded as the COGSA package, it profits OOCL nothing, for then, in the words of § 4(5) of the Act, this is a "case of goods not shipped in packages," in which event the carrier's liability is limited to $500 "per customary freight unit." "[I]n the absence of a declaration of the value of the goods in the bill of lading, COGSA limits the carrier's liability to $500 per package. 46 U.S.C.App. § 1304(5). When goods are not shipped in packages, as in this case, COGSA limits the carrier's liability to $500 per customary freight unit." *FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 79 (2d Cir.1988). "To determine the customary freight unit for a particular shipment, the district court should examine the bill of lading, which expresses the contractual relationship in which the intent of the parties is the overarching standard. A district court may also consider the tariff required to be filed with the Federal Maritime Commission, which also sets forth the freight rate." *Id.* at 80 (citations and internal quotation marks omitted). In the case at bar, the bill of lading clearly shows that the amount of freight on this shipment of 17 containers was calculated per container. Apparently that calculation was based on OOCL's tariff; the bill of lading refers to "TARIFF ITEM 9999291000," "FREIGHTED AS 17/40'" at a "RATE" of $650 for a total freight on that item of $11,050, which is $650 times 17. Therefore the container becomes the "customary freight unit" under the Act, and the $500 limitation on the carriers' liability to Ford remains the same.

## III. CONCLUSION

For the foregoing reasons, OOCL's motion for partial summary judgment is denied and Sea–Land's cross-motion for partial summary judgment is granted. Any obligation on the part of Sea–Land to indemnify OOCL in respect of OOCL's settlement payment to Ford is limited to $500. I reach no other issue.

The parties are directed to attend a status conference on January 12, 2001, at 2:00 p.m. in Room 17C, 500 Pearl Street.

It is SO ORDERED.