MARCRAFT CLOTHES, INC., Plaintiff,

v.

M/V "KUROBE MARU", her engines, boilers, etc.,

v.

MITSUI O.S.K. LINES, LTD. and Nippon Yusen Kaisha (NYK Line), Defendants.

No. 83 Civ. 2964 (ADS).

United States District Court, S.D. New York.

Nov. 30, 1983.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; John E. Cone, Jr., Helen M. Benzie, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants; Armand M. Pare, Jr., William Xanttopoulos, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

The Second Circuit has often interpreted the term "package" in section 4(5) of the Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. § 1304(5), by which "Congress intended to foster certainty and security in the shipping business." *Allied International American Eagle v. S.S. Yang Ming*, 672 F.2d 1055, 1057 (2d Cir. 1982). But "pockets of legitimate disagreement" persist. *Id.; Cameco, Inc. v. S.S. American Legion*, 514 F.2d 1291, 1297 (2d Cir.1974). The maximum amount of statutory liability is measured by the number of "packages" carried. Because the statute fails to define the term "package," however, the statutory language is inadequate "when measured against the dramatic changes in shipping and transportation since the statute was originally enacted." *Yang Ming*, 672 F.2d at 1064; *see Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 820 (2d Cir.1981); *Cameco*, 514 F.2d at 1297–1300; *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 814–15 & n. 18 (2d Cir.1971). This 1936 statute must now be applied in a universe of shipping technology significantly altered by the advent of containerization. The risk of commercially unreasonable results has become substantial. In this case, for example, depending on the meaning given to the term "package," the defendant might face maximum liability as low as $500 or as high as $2.2 million.

Plaintiff Marcraft Clothes ("Marcraft"), a commercial buyer of men's suits, brought this action against defendants Mitsui O.S.K. Lines, Ltd. ("Mitsui") and Nippon

Yusen Kaisha ("NYK Line") as carrier, for damages allegedly sustained when 4,400 suits arrived in New York in damaged condition. Defendants have moved pursuant to Fed.R.Civ.P. 56 for partial summary judgment contending that their liability should be limited to $500 as a matter of law.

Section 4(5) of COGSA provides in pertinent part:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding *$500 per package* lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C. § 1304(5) (emphasis added).

Defendants contend that the one shipping container furnished by the carrier is a single "package" within the meaning of section 4(5), which thus limits their total liability to $500. Alternatively, defendants suggest that, were the container found not a "package", then damages should be calculated per customary freight unit. Marcraft, on the other hand, argues that a deviation occurred from the voyage contracted which was so unreasonable as to justify displacing the COGSA limitation of $500 per package. Alternatively, plaintiff reasons, if the COGSA limitation is applicable, then each of the 4,400 suits is a "package" within the meaning of section 4(5), making defendants' potential liability as high as $2.2 million.

### I. *Unreasonable Deviation*

■ Marcraft suggests that an unreasonable deviation from the voyage prescribed in the bill of lading may have caused the damage to the goods. Because unreasonable deviation is treated as a breach of COGSA and the contract of carriage, it strips the carrier of the protection of the liability limitation, *see DuPont de Nemours International S.A. v. S.S. Mor-*

*macvega,* 493 F.2d 97, 100 n. 9 (2d Cir. 1974); *Nemeth v. General S.S. Corp.,* 694 F.2d 609, 613 (9th Cir.1982); *but see Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt,* 313 F.2d 872, 875 (7th Cir.1963), *cert. denied,* 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963), though several authorities indicate that the carrier may avoid this result by demonstrating that the deviation did not cause the damage, *see World Wide S.S. Co. v. India Supply Mission,* 316 F.Supp. 190, 1971 A.M.C. 498 (S.D.N.Y. 1970); Gilmore & Black, *The Law of Admiralty,* § 3–41 (2d ed. 1975) (hereinafter Gilmore & Black); *see also Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1209–10 & n. 26 (2d Cir.1975) (placing on deviator burden of establishing lack of causation, without deciding whether it constitutes defense); *Swindell-Dressler International Co. v. M/V Hellenic Ideal,* 500 F.Supp. 649, 651 n. * (S.D.N.Y.1980).

■ In this case, however, Marcraft has failed to raise a material issue of fact as to the conformity of the voyage with the bill of lading. Marcraft objects that the bill of lading does not make clear that the shipment was to be transported initially by a vessel other than the Kurobe Maru and to be trans-shipped at Kobe, Japan. But the notations in a series of boxes placed prominently at the top of the bill of lading indicate that pre-carriage was to be undertaken by "KOREAN EXPRESS V/124," that the ocean vessel was to be the "KUROBE MARU 0061A OR SUB.," and that the port of loading was to be "BUSAN, KOREA FOR T/S AT KOBE." Thus, the bill of lading named both vessels and the points of both initial loading and trans-shipment. Because Marcraft fails entirely to explain how the information so set forth might have engendered confusion, and because it does not contend that the vessel deviated from the Busan-Kobe-New York route, it has failed to raise a triable issue of deviation. The COGSA per package limitation of liability applies.

### II. *Section 4(5)—What is the "package"?*

■ Any proposed construction of section 4(5) that would reduce a carrier's liabil-

ity below a reasonable limit must be examined critically. *Mitsui*, 636 F.2d at 815. The term "package" must be interpreted in light of the dual purposes of § 4(5), which not only limits liability by fixing an irreducible minimum of immunity, but also voids any agreement designed to reduce the carrier's liability below that level. *Id.* at 814.

Carriers have attempted to capitalize on the technological advance of containerization by arguing that each container is a "package" for which the shipper can recover at most $500. The Second Circuit has repeatedly rejected this contention, reasoning that the intent of section 4(5) was to establish

> a reasonable figure below which the carrier should not be permitted to limit his liability and that "package" is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained."

*Leather's Best*, 451 F.2d at 815 (footnote omitted). Because in effect the container is but "a modern substitute for the hold of the vessel," *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 270, 97 S.Ct. 2348, 2360, 53 L.Ed.2d 320 (1977), its use should not be permitted to undermine Congress' intention "to prevent carriers from using their superior bargaining power to compel shippers to agree to provisions reducing their liability to insignificant amounts," *Mitsui*, 636 F.2d at 815.

 COGSA allows some freedom to vary its terms by agreement, "but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of diminishing them." Gilmore & Black, § 3–25 at 145 (emphasis in original). A carrier may not unilaterally decrease its liability by ambiguous entries in the bill of lading designed to suggest that the container is a "package."

In *Mitsui*, the Second Circuit explicitly supplanted former law on liability for containerized goods, including the "functional economics" test. The court applied the square holding of *Leather's Best* that "at

*least when* what would ordinarily be considered packages are shipped in a container supplied by the carrier and the number of such units is disclosed in the shipping documents, each of those units and not the container constitutes the 'package' referred to in § 4(5)." *Mitsui*, 636 F.2d at 817 (emphasis added). Carrier-furnished containers whose contents are fully disclosed are not COGSA "packages".

 In this case, the bill of lading contained a description of the goods enclosed: "4,400 Sets of Men's Suits with Vest." Defendants' theory supposes that, without their container, these suits would have been shipped in boxes. The *Mitsui* court put to rest the rule, however, that the container is presumptively the package where the units inside are not suitable for breakbulk shipment: "Even if this might tend to show that each of those units is not a package—a conclusion that is by no means ineluctable—it does not at all follow that the container is." 636 F.2d at 818. The Second Circuit recently reaffirmed the *Mitsui* standard:

> *Mitsui* and our decision today will put carrier interests on notice that the container will not be considered the COGSA "package" where the bill of lading discloses the contents of the container.... [W]e hold today that in the absence of clear and unambiguous language indicating agreement on the definition of "package," then we will conclusively presume that the container is *not* the package where the bill of lading discloses the container's contents.

*Smythgreyhound v. M/V "Eurygenes"*, 666 F.2d 746, 753 & n. 20 (2d Cir.1981) (emphasis in original). As a matter of law, the container is not a "package" under the circumstances of this case.

The question remains whether each suit is a COGSA "package." Each suit in this shipment was individually wrapped with a plastic bag after having been placed on a hanger. In *Mitsui*, the court dealt with two separate and distinct shipments. One shipment consisted of individual rolls of floor coverings; the other of stacks of in-

gots. The court held that each of the rolls was the "package" to which the COGSA limitation applied, but that the stacks of ingots were not individual "packages." The court reasoned:

> While the raw rolls of floor covering would not themselves have been packages, here the shipper had wrapped them (whether sufficiently for breakbulk shipment or not is immaterial), had inserted fibre discs at the bottom and the top to protect the rolls, and had wrapped the bottom with a burlap cloth to hold the discs in place. Moreover, it had done everything possible in the bills of lading to put [the carrier] on notice that it considered it was shipping rolls of floor covering and not just loaded containers.
>
> The [ingots] case is more difficult. The stacks of ingots, though described as "bundles", did not conform to the ordinary meaning of that term. The shipper had done nothing to hold them together, although that had been the custom even after containerization. While piling the ingots in stacks reduced the ground area on which they were stored prior to shipment and facilitated loading and unloading by permitting the stacks of ingots to be raised and lowered as such rather than individually, we do not see how these stacks could be regarded as packages in the ordinary meaning of language....

672 F.2d at 821–22.

Under this reasoning, each suit in the shipment at issue was a package. Each suit in its raw condition may not be a section 4(5) "package", but here the shipper had placed the suits on a hanger and wrapped each in a plastic bag in such a way as to conform to the accepted definitions of package, such as " 'a small or moderate size pack, ... a commodity in its container [the plastic bag], ... [or] a protective unit for storing or shipping a commodity.' " *Id.* at 814 (quoting Webster's Third New International Dictionary 1617 (1966)). Whether the shipper's packaging method was sufficient for breakbulk shipment is irrelevant. *Id.* at 821. Moreover, the bill of lading put the carrier on notice that 4,400 suits were being shipped, not simply a loaded container.

Defendants' reference to *Allied International American Eagle v. S.S. Yang Ming,* 672 F.2d 1055 (2d Cir.1982), is unpersuasive. First, the *Yang Ming* analysis pertains to pallets, not containers. The shipper usually provides the pallets and chooses to ship in this manner, while the carrier generally provides a container and requires the shipper so to transport his goods. Further, in *Yang Ming,* the Second Circuit made clear that *Mitsui* did not replace contract analysis with notice analysis, and held that "written notice of the number of [units] on a pallet, even in the bill of lading, is not binding on the carrier if, elsewhere in the bill of lading, the parties express agreement upon a number of 'packages', which counts only the pallets." *Id.* at 1061 (footnote omitted). The parties in *Yang Ming* expressly stated in the bill of lading that the total number of packages shipped was thirty. To read the other statements in the bill of lading consistently with the express statement that the shipment consisted of thirty packages, each pallet had to be counted as a "package." *Id.* at 1057. The bill of lading under consideration here expresses no agreement as to the number of packages being transported, but only indicates that one container was placed aboard the ship. Where, as here, the contract reflects an absence of agreement between the parties, the rule in *Mitsui* controls.

Defendants' motion for partial summary judgment is denied. Though the liability limitation is $2.2 million (4,400 suits × 500 per package), plaintiff must still prove his damages. As section 4(5) demands: "In no event shall the carrier be liable for more than the amount of damages actually sustained," and the carrier's liability for damages must be predicated on fault. *See generally,* COGSA, section 4(2)(a)–(p); Gilmore & Black, §§ 3–26 to 3–39.

SO ORDERED.