**BINLADEN BSB LANDSCAPING,**
Plaintiff,

v.

**M.V. NEDLLOYD "ROTTERDAM", her engines, boilers, etc., and Nedlloyd Lijnen B.V. (Nedlloyd Lines), Defendants.**

No. 82 Civ. 1037 (ADS).

United States District Court,
S.D. New York.

June 25, 1984.

SOFAER, District Judge:

Plaintiff, Binladen BSB Landscaping (hereinafter "Binladen"), was the shipper and consignee of a shipment of ten refrigerated containers of live plants from the United States to Jeddah, Saudi Arabia in June and July 1980. Nine containers were shipped from Miami under Miami/Jeddah bills of lading RC–1 and RC–2 dated June 14, 1980. One container was shipped from Houston under Houston/Jeddah bill of lading RC–1 dated June 11, 1980. Def. Ex. B, C, D. The plants involved in this shipment were to be used in a landscape project at one of the palaces of the then—Crown Prince Fahd, the present King of Saudi Arabia. Prior to this shipment plaintiff had received other refrigerated shipments of live plants in Saudi Arabia. Lavargna Dep. 33, 42–44.

Defendant, Nedlloyd Lijnen B.V. (hereinafter "Nedlloyd"), was the owner and operator of the M.V. "NEDLLOYD ROTTERDAM" during the time of the events in question. The containers in question were carried on board the NEDLLOYD ROTTERDAM Voy. 0115, a fully containerized, roll on-roll off vessel. When the shipment was picked up by plaintiff in Jeddah, the plants in two containers were diseased and destroyed, resulting in a loss to plaintiff of the freight and value of those plants. After a trial to the court, plaintiff established that defendant is liable for its total loss, for the reasons set forth in the following findings and conclusions.

Plaintiff paid freight on a container basis, at a rate that reflected the additional cost of refrigeration. The containers were properly packed by plaintiff's suppliers, and returned to the load ports for loading. All the plants shipped had been properly inspected and were in good condition when delivered to Nedlloyd. Ramirez Dep. 12, 18, 34–38. One of the containers at issue, ITLU 720073–6, was delivered to Nedlloyd in Houston on June 10, 1980. The other, SCXU488906–1, was delivered to Nedlloyd in Miami on June 13, 1980. Nedlloyd failed to produce partlow charts which would

have demonstrated whether these containers were operating properly prior to their being connected to power on board the NEDLLOYD ROTTERDAM.

■ With respect to the Houston container, the temperature specified by plaintiff (78°) was appropriate for the plants shipped. Tr. 197–201. The court rejects testimony to the contrary. Tr. 184–85. The plants could not properly be transported without air circulation and refrigeration that kept down the humidity in the container. Nedlloyd as carrier of the plants and supplier of the reefers should have known the proper manner of maintaining the temperature specified, and was obligated to provide reefers that functioned properly in all material respects, including their capacity to dehumidify. *Carribean Produce Exchange, Inc. v. Sea Land Service, Inc.,* 415 F.Supp. 88 (D.P.R.1976) (carrier cannot avoid responsibility for operation of refrigeration); *Atlantic Banana Company v. M.V. "CALANCA",* 342 F.Supp. 447, 452 (S.D.N.Y.1972), *aff'd mem.,* 489 F.2d 752 (2d Cir.1974). If the container lacked circulation, as Mr. Hans Zutter assumed, then Nedlloyd is responsible for that result, although the proof did not establish a lack of circulation. The container used for the Houston/Jeddah trip was not properly checked, despite two potentially significant malfunctions before the trip. First, it was inoperative when delivered to Garden World, plaintiff's supplier in Laredo. Nedlloyd's agent arranged for repairs, consisting of a fuse replacement and adding the refrigerant freon. Pl.Ex. 12; Ramirez Dep. 7, 27. Second, when the container was delivered to the Nedlloyd terminal in Houston it was inspected and again found to be low in freon; a sight-glass was tightened, apparently because it was thought to be the source of the leak.

This was not an adequate response to the condition. As all the experts testified, including Nedlloyd's, the container should have been checked comprehensively after two shortages of freon to determine the source of the leaks. Tr. 130–32; 225–26; 294–95. No such check was done. A proper inspection prior to the voyage would also have included a check of the calibration of the reefer sensors which activate the switch that initiates the heating mode. Tr. 46, 313–314. Nedlloyd produced no pre-trip partlow charts or other evidence of proper inspection and calibration. As the expert Robert J. Wall's testimony suggests, such lack of proper records of maintenance and operation was inconsistent with proper practice. *See, e.g., Tupman Thurlow Co. v. S.S. CAP CASTILLO,* 490 F.2d 302, 308 (2d Cir.1974).

The Houston container was received by Nedlloyd at Houston on June 10 at 4:13 p.m. Pl.Ex. 17. The available evidence establishes it was hooked up to power on the ROTTERDAM at 5:00 a.m., June 11. *See* Def.Ex.N. Nedlloyd's partlow charts for the period prior to 5:00 a.m., June 11, are missing, so it is impossible to know whether the proper practice was followed, or whether the container was left disconnected for about half a day. Nedlloyd failed to produce the partlow charts that would have cleared up this uncertainty.

The Houston container never defrosted during the voyage to Jeddah. Pl.Ex. 28, 37; D.Ex.N; Tr. 100–01, 123–24, 272; Meijer Dep. 70. Why this occurred is not entirely clear, but may have resulted from improper calibration, the shortage of freon, or some other deficiency. *See, e.g.,* Tr. 298, 305–06. A build-up of humidity was certain to occur which, along with the earlier stress placed on the plants through a delayed hook-up, could readily explain the bacterial growth that killed the plants. A telex sent by the Nedlloyd representative at Jeddah on February 24, 1981, stated that the Houston container was malfunctioning when it left the ship. Pl.Ex. 35. This statement was later reversed, but the court is not satisfied that the statement was in fact erroneous, given the other evidence and the unlikelihood that container numbers could have been confused.

The other container in which all the plants shipped died was SCXU488906–1, or the Miami container. It was properly loaded and packed, with healthy plants, and

delivered to Nedlloyd with four other filled containers. The carriage temperature specified (58°F) was correct, and the plants in the other containers in this shipment arrived in Jeddah without significant damage. As with the Houston container, Nedlloyd's proof of proper handling is deficient.

■ The Miami container was delivered to Nedlloyd on June 13, 1980, at 5:00 p.m.; the first proof that it was hooked up to electricity was a chart commencing at 6:00 a.m. on June 16. D.Ex.M., Tr. 230–31. In addition, the first temperature recorded on the relevant partlow chart was 66°F, rather than 58°F, and during June 13–15 the daily high temperature went far above 58°F, averaging some 85°F. P.Ex. 39. This container also failed to defrost for at least two days. D.Ex.M; Tr. 107–111, 117. If the container was not ventilated, as counsel for Nedlloyd suggested when convenient for him to do so, failure to properly open the vents was Nedlloyd's fault. P.Ex. 37; Tr. 176–77, 189–90. In fact, ventilation must have been provided to all containers, or all would have been delivered with dead plants. The combination of the delayed hookup, after an unrefrigerated trip on land, with the failure to dehumidify for two days probably damaged the plants even though the container subsequently functioned properly during the voyage. *See* Tr. 173–79.

Thus, excess humidity, resulting from a delayed hookup and container malfunctions, most probably caused the death of the plants in both the Miami and Houston containers. *See e.g.,* Lavargna Dep. 25–26. In connection with both containers, the court credits the testimony of Douglas L. Roberts that the reefers must not have been operating properly.

Both the Houston and Miami containers failed to function properly after delivery at Jeddah to MTI, the port's terminal operator, on July 4. It is more probable than not that the plants in both were already irreversibly damaged, which finding is based in part on Nedlloyd's failure to produce proper records. *S.S. CAP CASTILLO,* 490 F.2d at 308. (The nonproduction of materi-al evidence which is in control of a party raises an inference that the evidence is unfavorable to that party). In any event, delivery did not occur when the containers were given by Nedlloyd to MTI, but when they were picked up by Binladen, within a reasonable time after notice of their arrival. Binladen was under no obligation to remove the two containers immediately after getting the claimed notice of their malfunction from Alatas, Nedlloyd's agent. Furthermore, such action by the time of notice would not have prevented the damage in light of the extremely high temperatures involved, and might not even have resulted in Binladen's obtaining the containers under Saudi rules. *See* Meijer Dep. 139–41. Moreover, the containers had apparently been malfunctioning after discharge; MTI, whose responsibility it was to notify Alatas of container malfunctions, D.Ex. K.K., § 3.3., failed to notify Alatas as to the Houston container malfunction and did not tell Alatas of the Miami container malfunction until four or five days after discharge. Meijer Dep. 129–30.

■ The normal admiralty rule applies here, because Nedlloyd incorporated COGSA into its bills of lading, and no contrary custom or usage of the port of destination has been satisfactorily or convincingly established. *See Tapco Nigeria, Ltd. v. M/V WESTWIND,* 702 F.2d 1252, 1255 (5th Cir. 1983) (custom, regulations, or law of port of destination can modify common law requirements); *cf. Farrell Lines, Inc. v. Highlands Ins. Co.,* 696 F.2d 28 (2d Cir. 1982) (carrier discharged of responsibility because of port's custom and usage). While the Saudi port regulations reserve control to Saudi authorities over the handling and discharge of goods, those rules fail to establish that the port authorities act in behalf of the consignee rather than the carrier. Nedlloyd as carrier pays the Saudi port authority for its services, *see* D.Ex. KK, including specifically the surcharge for the first three days for connecting and maintaining reefers, and for notifying the shipper of malfunctions. *Id.* § 3.3. Binladen, on the other hand, had no contact

with the port authorities except to pick up its goods when authorized to do so by Nedlloyd.

Nor do the rules establish that Nedlloyd relinquished total control of the goods to MTI. *Cf. Tapco*, 702 F.2d at 1260 (regulations requiring that government-employed stevedores take *total control* of the cargo from ship's holds until *finally delivered* to consignee absolved carrier from any responsibility for losses during unloading). To the contrary, the Saudi port regulations make clear that the carrier, through its agent, retains certain responsibilities with respect to the cargo, even following discharge at port of the containers.

For instance, it is the ship agent's responsibility to undertake, "on behalf of the vessel, its owners, or its charterers, all activities related to goods." *Rules and Regulations for Saudi Arabian Seaports*, Part 2, § 2.2.2.2. (1980). Specifically, the ship's agent must notify consignees when the goods arrive, § 6.2.9.1, and "shall attend to all loading and unloading operations" and may provide independent tally clerks "to count the parcels of every consignment, record their condition and make any qualifications or observations and take remedial action where necessary." § 2.2.-2.3. "Delivery of goods" is permitted under Saudi regulations only "on presentation of a Bill of Lading or Delivery Order duly endorsed by the ship's agent." D.Ex. "D.D."; § 7.10.1. Also, it is the ship's agent's duty to "send regular reminders to consignees to take delivery of any overdue containers or trailer from the port." § 7.11.2. The above rules seem to indicate that it is the ship's agent, rather than the terminal operator or consignee, who must keep track of the container until the goods have been delivered to the consignee.

Other port regulations which tend to show that the carrier retains some control over the cargo even after the cargo has been discharged by the terminal operator are the requirements that the ship's agent supply the Port Management with a "detailed list of containers which have been lying in the port for a period of more than 15 days", § 7.6.2(e), and that the agent return full details of any container that the consignee refuses to release or return. § 7.6.5.

Nedlloyd has also failed to establish that the regulations control issues of liability among the parties so as to require Binladen to sue the Saudi port authorities. The rules provide that the carrier is responsible for any loss caused by the negligence of the "terminal operator," which is the common-law rule. D.Ex.D.D.; *see* § 7.17.3. The provision establishing the terminal operator's liability to the "owner" appears to relate to the terminal operator's responsibility to indemnify the carrier, and cannot safely be read to control the carrier's obligations. Nothing in the regulations suggests that, as between carrier and consignee, the consignee must bear the risk of loss from the time that the goods are discharged from the vessel to the time the goods are delivered to the consignee. Nedlloyd's corporate secretary, Joan C. Walker, testified that she could not locate the contract between Nedlloyd and Alatas, which may have cast further light on these issues. Tr. 67.

Thus, even if Binladen had failed to prove that the plants were irreversibly diseased when delivered to the Jeddah port authorities, it would be entitled to the evidentiary benefits that flow from establishing a prima facie case. The plants were certainly lost when delivered to the consignee (or indeed by the time the consignee was notified of the container malfunctions), so Nedlloyd was responsible for the damage, having failed to establish any exception to the rule. *See* 46 U.S.C. § 1300; *S.S. CAP CASTILLO*, 490 F.2d at 303.

Nedlloyd's argument that its liability should be limited to $500.00 per container is untenable. Carrier-furnished containers whose contents and number have been fully disclosed on the bill of lading are not COGSA "packages." *Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 818 (2d Cir.1981). Here, Nedlloyd furnished the two containers, and the bills of

lading disclose the contents of the containers as being "7790 LIVE PLANTS" and "11420 LIVE PLANTS MISC. AND 24 PKGS. SHADE CLOTH". D.Ex. B, C, D. Each plant in the two reefers was individually wrapped, potted, or separated; some were individually boxed. Moreover, the parties did not unambiguously agree on a definition of package, so the containers are conclusively presumed not to be individual packages. *Smythgreyhound v. M/V "EURYGENES"*, 666 F.2d 746, 753 n. 20 (2d Cir.1981). The bills of lading each include in the column titled "NO. OF PKGS" the number "1". But this is hardly the unambiguous declaration necessary to put the shipper on notice of a limitation of liability. *See generally Marcraft Clothes, Inc. v. M/V "KUROBE MARU"*, 575 F.Supp. 239 (S.D.N.Y.1983) and cases cited therein.

The losses alleged by plaintiff have not been controverted. The clerk will therefore enter judgment in plaintiff's behalf against defendants for $80,322.00 plus interest at 12% from the date of delivery, July 4, 1980, and costs.

SO ORDERED.