**BINLADEN BSB LANDSCAPING,**
**Plaintiff-Appellee,**

v.

**M.V. "NEDLLOYD ROTTERDAM", HER ENGINES, BOILERS, ETC., NEDLLOYD LIJNEN B.V. (NEDLLOYD LINES), Defendant-Appellant.**

**No. 463, Docket 84–7710.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 1984.

Decided April 3, 1985.

---

J. Scot Provan, New York City (Richard H. Sommer, Arthur E. Hoffmann, Jr., Esq., Kirlin, Campbell & Keating, New York City, of counsel), for defendant-appellant.

John E. Cone, Jr., New York City (William R. Connor III, Helen M. Benzie, Lawrence B. Brennan, Bigham Englar Jones & Houston, New York City, of counsel), for plaintiff-appellee.

Before MANSFIELD, OAKES and NEWMAN, Circuit Judges.

MANSFIELD, Circuit Judge:

We are once again called upon to interpret § 4(5) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5) (1982) ("COGSA" or "the Act"), which limits the carrier's and ship's liability to "$500 per package ..., or in case of goods not shipped in packages, per customary freight unit," unless the shipper explicitly declares a higher value. Appellant here, a Netherlands ocean carrier, appeals from a judgment of the Southern District of New York awarding $80,-332.00 damages against it after a bench trial before Judge Abraham D. Sofaer, based on its role in the untimely death of more than 10,000 plants shipped overseas in two containers on board its ship, the M.V. "Nedlloyd Rotterdam." The district court applied the $500 "per package" limit of § 4(5). We hold instead that the plants were "goods not shipped in packages" within the meaning of the Act and accordingly reverse and remand the case for a determination of damages limited to $500 "per customary freight unit" used in shipments of this type.

In June 1980, appellee Binladen BSB Landscaping ("Binladen"), a Swiss company, contracted with appellant Nedlloyd Lijnen B.V. ("Nedlloyd") to ship ten refrigerated containers loaded with plants from two locations in the United States to Saudi Arabia, where the plants were to adorn the palace grounds of that country's crown prince, who is now its king. Binladen and its agents packed and filled the containers, which were delivered to Nedlloyd and loaded on the M.V. "Nedlloyd Rotterdam," a fully containerized vessel, for the journey.

Although most of the plants in eight of the ten containers arrived in Saudi Arabia intact and healthy, those within the remaining two containers were brittle and lifeless when opened and inspected by a Binladen employee in Jeddah.

In early 1982 Binladen brought a maritime action in the Southern District of New York for damages against Nedlloyd and against the M.V. "Nedlloyd Rotterdam."[1] Nedlloyd denied responsibility for the plants' death and also asserted an affirmative defense based on the limited liability provision of COGSA. In a pretrial memorandum of law Nedlloyd argued that neither container carried "packages"; rather, it contended, each of the two containers was a "package" in which the plants inside were shipped. Nedlloyd therefore claimed that its liability was limited to $500 per container. Alternatively it proposed that the plants were "goods not shipped in pack-ages" and that its liability accordingly must be limited to $500 per customary freight unit, which it contended was also the container. Binladen counter-argued that the plants were individually prepared for shipping and that each therefore counted as a package under COGSA. It also argued that deficiencies in Nedlloyd's bill of lading served to strip the carrier of the benefit of COGSA's liability limits.

At trial in 1984 before Judge Sofaer, virtually all of the six days of testimony was devoted to evidence on liability. Evidence pertaining to the COGSA limitations on liability came out almost entirely in the exhibits, including the bills of lading and several depositions submitted in evidence during the trial. The latter show that one of the containers whose contents perished was the single container shipped from Houston, number ITLU–720073–6. Its bill of lading described the contents as follows:

PARTICULARS FURNISHED BY THE SHIPPER

| NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS |
|---|---|
| 1 | 40' REEFER CONTAINER SAID TO CONTAIN: 7,990 LIVE PLANTS |

The other spoiled container had been shipped from Miami under a bill of lading that covered five containers. That bill described a similar type of shipment:

PARTICULARS FURNISHED BY THE SHIPPER

| NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS |
|---|---|
| 5/40' | REEFER CONTAINERS SAID TO CONTAIN 11735 PCS. LIVE PLANTS MISC. AND 24 PKGS. SHADE CLOTH |

Further itemization in the "Description" column listed the "NO. PCS." in the container in which plants died, SCXU–488906, as 2436.

Deposition testimony introduced at trial revealed that the Houston container was loaded chiefly with cacti and that the Miami container carried nearly twenty sorts of plants and trees. Although the parties agreed that the Miami plants were individually potted,[2] they disputed the nature of the packing of the plants in the Houston con-

1. Binladen's complaint invoked admiralty jurisdiction pursuant to Fed.R.Civ.P. 9(h). Jurisdiction over the defendants in the Southern District was based in part upon the presence of the ship within the district during the pendency of the litigation.

2. The invoice/packing list for this Miami container also included 15 boxes of Canna Lilly bulbs, apparently unpotted. These were not mentioned on the bill of lading, and may not even have been included in the number of plants listed on the bill of lading, since the count of plants there was 15 less than the count on the invoice/packing list.

tainer. The deposition testimony of Antonio Eduardo Ramirez, the owner of Garden World Nursery in Laredo and the individual who had loaded the Houston container, included an item-by-item breakdown of the packing methods used. Read in conjunction with the nursery invoices for the sale, this testimony revealed that approximately 2,000 items were individually boxed, tied, or wrapped, more than 2,000 others had been boxed or tied in an unspecified manner, and the remainder had simply been stacked into piles.[3] Ramirez indicated that large sheets of cardboard, approximately 2½' by 4', had been used to separate different kinds of plants and different sections of the container.

Except for reference to the number of containers and plants, none of the foregoing information appeared on the bills of lading. Moreover, the deposition testimony of Philip Elsazsser, the former Binladen employee who had inspected the sorry car-

---

**3.** A careful reading of Ramirez's testimony along with the invoice/packing list from the nursery, reveals the following packing methods for the plants in the Houston container:

| Number | Item | Packaging |
|---|---|---|
| 481 | Large barrel cacti | "loosely packed"; "stacked" |
| 360 | Small barrel cacti | "loosely packed"; "stacked" |
| 250 | E. lactea | "loosely packed"; "packed within itself" |
| 490 | Wooly Torch (880') | "individually wrapped in paper and tied … and then those are stacked"; "wrapped and packed" |
| 734 | Mamillaria | "packed in cardboard boxes in their own containers" |
| 175 | Eagle Claw | "packed in cardboard boxes in their own containers" |
| 310 | Agave Falcata | "stacked within itself"; "loosely packed" |
| 491 | Victoria Reginae | "stacked"; "loosely packed" |
| 342 | A. trigorus | "boxed" |
| 782 | E. pectinatus | "boxed" |
| 250 | O. ficus indica | "boxed" |
| 510 | L. marginatus (795') | "individually wrapped and stacked"; "wrapped and stacked" |
| 500 | Aloe Vera (large) | "loosely packed" |
| 100 | Yucca | "tied" and "stacked"; "loosely packed" |
| 500 | A. Americana | "tied" and "stacked"; "loosely packed" |
| 280 | E. Tirucalli | "stacked" |
| 270 | Dasylirion Long | "tied and stacked"; "loosely packed" |
| 34 | Bombax Elipticum | "loosely packed" |
| 21 | Beaucarnea | "loosely packed" |
| 625 | Orchids (25 boxes) | "boxed" |
| 485 | Mixed Cacti | "boxed" |
| 7990 | TOTAL | |

---

Thus, almost 2000 plants were individually tied, wrapped or boxed for travel, i.e., the Wooly Torch (490), the Mamillaria (734), the Eagle Claw (175), and the L. Marginatus (510), plus 25 boxes of orchids. As to more than 2000 other plants Ramirez indicated that they were tied or boxed, but did not indicate that they were individually packaged. Rather, in answer to a question, he stated that the number of plants per box varied with the size of the item. As to the remaining plants, no individual packaging was mentioned, and some of these (e.g., the large

go remnants in Jeddah and who had actually walked through the Houston container, related that he saw no individual pots or boxes in that container. In support of that testimony, Binladen offered photographs taken by Elsazsser during the inspection. No boxes or individual wrapping or tying are evident in these photographs.

The bills of lading setting forth the shipping contracts between Binladen and Nedlloyd were on the standard form employed by Nedlloyd. These forms, in small print on the back, included a "U.S.A. CLAUSE" that expressly incorporated the provisions of COGSA, although it did not explicitly recite the $500 package limit. A blank space on the front of each bill of lading was labeled "EXCESS VALUATION" and referred the reader to a clause on the reverse side setting forth a £100 sterling liability limit per package or unit. Still another provision limited liability to $2 per kilo gross weight. The parties stipulated that Binladen prepaid to Nedlloyd $14,-245.36 each for the five refrigerated containers shipped from Miami under the one bill of lading and $15,420.50 for the transport of the refrigerated container shipped from Houston.

Judge Sofaer found that the carrier had failed to ensure that the proper temperatures, humidity and ventilation conditions were maintained in the containers during the voyage, and he therefore held Nedlloyd responsible for the loss. 593 F.Supp. 546 at 547–50 (1984). Having found Nedlloyd liable, Judge Sofaer then turned to the question of damages and the application of the COGSA $500 per package limit on carrier liability. He did not mention or make findings concerning Binladen's claim that the COGSA limit on liability was wholly inapplicable. Instead, he found that because the "bills of lading disclose the contents of the containers" and because the "parties did not unambiguously agree on a definition of package," the two containers themselves were not "packages" under the Act. 593 F.Supp. at 550–51. The Judge further stated that "[e]ach plant in the two and small barrel cacti (841)) were clearly de-

reefers was individually wrapped, potted or separated [and that] some were individually boxed." *Id.* at 551. He thereupon rejected Nedlloyd's argument that its liability should be limited to $500 per container and he awarded damages of $80,332.00 plus interest.

This appeal followed. On appeal, Nedlloyd does not dispute Judge Sofaer's conclusion on liability; it argues only that the Judge incorrectly awarded damages in excess of those permitted by COGSA's § 4(5).

## DISCUSSION

Since the enactment of COGSA half a century ago courts have struggled to interpret § 4(5) of the Act, which drastically limits the liability of carriers and ships as follows:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ..., or in case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted on the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

"By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.
...."

46 U.S.C. § 1304(5).

In resolving disputes between shippers and carriers over the consequences of the $500 per package limit on carrier liability the principal difficulty has lain in defining the meaning and scope of the word "package," a term left undefined by Congress. That scribed as being simply stacked.

problem has been exacerbated by the adoption of new methods of preparing and assembling goods for shipment. *Allied International American Eagle Trading Corp. v. S.S. "Yang Ming,"* 672 F.2d 1055, 1064 (2d Cir.1982). In construing the statute we have had to evaluate diverse and occasionally idiosyncratic items shipped in various forms—bundles, boxes, cartons, bales, coils, crates, rolls, skids, pallets, and containers—in order to determine what units, if any, constitute COGSA "packages." With the advent of containerized shipping, we have been required to decide when a container provided by a carrier to a shipper may constitute a "package" under COGSA, to which the $500 limit must be applied, and when items within a container must each separately be treated as packages. Here, for instance, we must decide whether each container or each plant within a container constitutes a "package" under COGSA.

At the outset we are governed by some basic principles that have been judicially developed for resolution of issues of the type before us. The first of these, rather obvious, is that the touchstone of our analysis should be the contractual agreement between the parties, as set forth in the bill of lading. *See Allied International American Eagle Trading Corp. v. S.S. "Yang Ming,"* supra, 672 F.2d at 1061 (when "pallets" are counted on bill of lading as the number of "packages" shipped, they, rather than the cartons on each pallet, constitute "packages" within the meaning of § 4(5)). Entries on the bill of lading are thus important evidence of the intent of the parties to the shipping contract, *see Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 335 (2d Cir. 1972); *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschiff-fahrts-Gesellschaft,* 375 F.2d 943, 946 (2d Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967), and the declaration on the bill may bind a shipper even when the contents of the shipment diverge from the description on the bill. *See Mitsui & Co.,*

*Ltd. v. American Export Lines, Inc.,* 636 F.2d 807, 823 (2d Cir.1981) ("When the [ship] sailed ... [the carrier] had no way of knowing that the shipper's representation [that ingots were in "bundles"] was false.... [T]his would seem a classic case for the application of estoppel."); *cf. also Aluminios Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152, 156 (2d Cir.1968) ("Having specified that the press was 'ONE (1)' package, they must abide by its meaning as a word of liability limitation."); *Associated Metals & Minerals Corp. v. A/S D/S Svenborg,* 1984 A.M.C. 376 (S.D.N.Y.1983) (stating, on this issue, that "an ambiguity in the bill of lading ... should properly be resolved against the party ... which prepared the instrument" (citation omitted)), *aff'd mem.,* 738 F.2d 418 (2d Cir.1984).

Secondly, no controlling definition of the term "package" has been judicially developed other than the requirement that it be the result of some "preparation [of the cargo item] for transportation ... which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Aluminios Pozuelo Ltd. v. S.S. Navigator, supra,* 407 F.2d at 155. Although this definition excludes certain types of cargo (e.g., loose liquids, potatoes, *Watermill Export, Inc. v. MV "Ponce,"* 506 F.Supp. 612, 617 (S.D.N.Y.1981), or fish, *Bumble Bee Seafoods v. S.S. Kiku Maru,* 1978 A.M.C. 1586 (D.Md.)), it is still broad enough to include a wide range of other items, such as a boxed roll of steel weighing 32½ tons, *Mitsubishi International Corp. v. S.S. Palmetto State,* 311 F.2d 382 (2d Cir.1962), *cert. denied,* 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 422 (1963), or materials lashed to skids or pallets, *Aluminios Pozuelo Ltd. v. S.S. Navigator, supra,* 407 F.2d at 156.

Thirdly, since the prevalent large metal shipping container furnished by a carrier is "functionally part of the ship," *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 815 (2d Cir.1971),[4] and classi-

---

**4.** This court has found that "containers are large metal boxes resembling truck trailers save for the absence of wheels, roughly 8' high, 8' wide and with lengths of up to 40' ..., capable of

fication of it as a "package" would violate the purpose of § 4(5) by permitting the carrier to limit its liability unduly, we have refused to hold a shipping container to be a COGSA package, absent a clear agreement between the parties to that effect, at least so long as "its contents and the number of packages or units are disclosed." *Mitsui & Co., Ltd. v. American Export Lines, Inc., supra,* 636 F.2d at 821; *accord, Smythgreyhound v. M/V "Eurygenes,"* 666 F.2d 746, 753 (2d Cir.1981). Thus when the bill of lading discloses not only the number of containers but the number of cartons within them, the cartons, not the containers, will be treated as COGSA packages. *Id.* However, we have left open the question whether a container may be deemed a COGSA package when the bill of lading "does not show how many separate packages or units there are." *Mitsui & Co., Ltd., supra,* 636 F.2d at 821 n. 18. As Judge Friendly noted in *Mitsui & Co., Ltd., id.* at 821, the 1968 Brussels Protocol To Amend the International Convention for the Unification of Certain Rules of Law Relating to BILLS OF LADING, 6 Benedict on Admiralty, 1–25 to 1–30 (7th Ed. 1984), which has been agreed to by some 17 countries, provides that in such a case the "article of transport," i.e., the container, shall be deemed to be the package.[5]

■ Lastly, absent an agreement in the bill of lading as to packaging of the cargo, goods placed in containers and described as not separately packaged will be classified as "goods not shipped in packages," for which the $500 liability limit would be per "customary freight unit." *Watermill Export, Inc. v. MV "Ponce," supra,* 506 F.Supp. at 617.

■ Applying the foregoing principles to the present case, although the bills of lading listed in the column entitled "No. of Pkgs." the number of containers shipped and revealed the total number of plants in the containers, they gave no indication whether or how the plants were packaged. The case is therefore significantly different from *Smythgreyhound, Mitsui & Co., Ltd.,* and other decisions cited *supra,* in which the bill of lading listed not only the number of containers but the number of items qualifying as packages (i.e., connoting preparation in some way for transport), such as "bundles," "cartons," or the like. We cannot accept Binladen's contention that the reference in the bills of lading to the number of plants qualifies each plant as a separate COGSA package.[6]

carrying hundreds of packages in the normal sense of that term"; that containers "are typically supplied by the carrier, must be returned to the carrier by the consignee, and are used and reused hundreds of times"; that "[m]any ships ... are so constructed that shipments must be made in containers"; and that the shipper "normally ... [does not pay] for the weight of the ... container." *Mitsui & Co., Ltd. v. American Export Lines, Inc., supra,* 636 F.2d at 816.

5. The 1968 Brussels Protocol provides in pertinent part:

"Article 2

"...

"(c) Where a container, pallet or similar article of transport is used to consolidate goods, the number of packages or units enumerated in the bill of lading as packed in such article of transport shall be deemed the number of packages or units for the purpose of this paragraph as far as these packages or units are concerned. Except as aforesaid such article of transport shall be considered the package or unit."

6. Binladen asks us to find that Nedlloyd waived any claim to the $500 per package limitation with regard to the shipment from Miami. The shipper bases this claim on several statements by Nedlloyd's counsel at the start of the trial below, namely:

"Now, in the container that went out from Miami, they are actually potted. However, the ones that went out from Houston, although the witness in Houston stated that some of them were packaged, the plaintiff's witness was on hand in Jeddah.

....

"I have no problem with the Miami plants. They were plants. They were potted. But all of a sudden when you get the testimony of the plaintiff's witnesses, there was absolutely no packaging in the containers from Houston...."

We decline to hold that Nedlloyd's has waived limited liability as to the Miami shipment. The statements above are not unambiguous waivers of Nedlloyd's contractual rights. They appear merely to reflect counsel's acknowledgment that there was no factual dispute about the potting of the Miami plants and his recognition that there was a much stronger case to be made that many of the Houston plants were wholly untreated in

It is true that some of the plants were in fact prepared for shipment in ways that might have entitled them, if properly described in the bill of lading, to treatment as packages as defined in *Aluminios Pozuelo, Ltd. v. S.S. Navigator, supra.*[7] But the word "plant," standing alone in a bill of lading, does not describe an item that has been packaged for transport. Nor can a carrier that has agreed to transport a container described in the bill of lading as filled with a certain number of "live plants" reasonably infer from this description that each plant has been so packaged.[8] Some plants may be simply stowed or stacked without potting, tying, wrapping or other preparation for shipping, in which event they are not individual packages but rather "goods not shipped in packages." *Cf. Watermill Export, Inc. v. MV "Ponce," supra,* 506 F.Supp. at 617 (loose potatoes shipped in trailers); *see also Mitsui & Co., Ltd. v. American Export Lines, supra,* 636 F.2d at 821–22 (stacks of ingots). Indeed, the testimony of Ramirez, the owner of the nursery and the person who loaded the Houston container, amply documents that some plants can be transported without packaging, or packaged singly or in groups of up to 25 or more.[9] According to the bills of lading in the present case, which constitute the agreements between the parties, each of the "plants," as so described, cannot be viewed as an individual COGSA package. This case is therefore analogous to *Sperry Rand Corp. v. Norddeutscher Lloyd,* 1973 A.M.C. 1392, 1398–99 (S.D.N.Y.), in which Judge Lumbard was confronted with a bill of lading that listed the "number and kind of packages" as "1 container" and described the contents as 9,500 electric shavers.

7. We need not reach the question of which plants were prepared for transport in a way entitling them to be classified as packages, nor need we calculate exactly how many packages there were in the Houston container, given the various ways in which these plants were loaded. One may reasonably argue, for instance, that the plants in the Miami container may have been placed in pots to keep them alive, not for purposes of transport. Nor do we reach the question whether our conceptual definition of a package may impose limits on the types of items that parties may agree to treat as packages. *Cf. Bumble Bee Seafoods v. S.S. Kiku Maru,* 1978 A.M.C. 1586 (D.Md.) (refusing to hold that a shipment of 67,222 fish was a shipment of that many packages, even though that number was entered in the "Packages" column on the bill of lading and no other count was apparently given).

8. Although a Department of Agriculture phytosanitary certificate accompanying the Miami shipment listed the plants involved as "packed preparation for shipment. At the very time of this conversation, the trial judge was on notice that Nedlloyd sought to apply the liability limit to both the Miami and Houston shipments. Nedlloyd had explicitly made both arguments in a pretrial memorandum of law. Although Nedlloyd's post-trial memorandum of law restated the argument for limited liability as to the Houston shipment but did not do so as to the Miami shipment, we do not view this omission as constituting a waiver of its statutory rights as incorporated into the shipping contract.

loose in pots within sea wheel trailers," this mention of packaging in a supplemental document of this nature, particularly one unrelated to the contract between the parties, cannot substitute for disclosure in the bill of lading. This document was apparently issued to the nursery that packed the plants into the Miami container and may not even have been read by the carrier. Unlike a bill of lading or a dock receipt, *cf. Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts Gesellshaft, supra,* 375 F.2d at 946, it has no bearing on the agreement between the parties.

9. This testimony in fact indicates that many plants in the Houston shipment were stacked without packaging. In this respect, we find clearly erroneous Judge Sofaer's statement that "[e]ach plant ... was individually wrapped, potted or separated [and that] some were individually boxed" (emphasis added).

Although it was reasonable for Judge Sofaer to have rejected Elsazsser's testimony that there were no packages at all, the Judge's factual finding cannot be sustained by reference to the Ramirez deposition, the only other evidence concerning packaging within the Houston container. While Ramirez indicated that *many* of the plants were individually treated in the ways described by Judge Sofaer, he did not state that all of them were. Rather, the deposition makes clear that about 2000 were so treated, many others were tied, wrapped or boxed in an unspecified number, and the remainder, nearly 3000, were loosely packed, i.e., stacked logcabin style in piles, which might in turn be separated from each other by large cardboard dividers. *See supra* note 3.

Although it was shown at trial that there were actually 190 cartons packed with 50 shavers each, Judge Lumbard correctly refused to hold the cartons (and the shavers) to be packages under COGSA and instead held the container to be the package.[10]

There remains the question, reserved in *Mitsui's* footnote 18 and in *Smythgreyhound,* of whether, when a bill of lading lists only the number of containers under "No. of Pkgs." and does not describe the cargo in terms of items that can reasonably be understood as packages, the parties must be deemed to have agreed that each container constitutes a COGSA package. The principal argument against so holding is our repeatedly-expressed reluctance for sound reasons to treat a container as a package. *See Mitsui, supra,* 636 F.2d at 816–17; *Leather's Best, supra,* 451 F.2d at 815; *Smythgreyhound, supra,* 666 F.2d at 750–55. On the other hand, nothing precludes the parties from agreeing in their contract (the bill of lading) that each container shall constitute a package. Indeed, recently, in *Allied International American Eagle Trading Corp. v. S.S. "Yang Ming," supra,* we took the view that in the present circumstances the container must be treated as a COGSA package, stating in dicta that:

> "when the bill of lading expressly refers to the container as one package, or when the parties fail to specify an alternative measure of the 'packages' shipped, the courts have no choice but to respect their express or implied understanding and to treat the container as a single package." 672 F.2d at 1061.

Moreover, we have held a container to be a COGSA package when it contained unpacked household goods that would, absent a container, have been shipped in a crate of comparable size. *Rosenbruch v. American Export Isbrandtsen Lines, Inc.,* 543

F.2d 967, 969–70 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976).

Upon balancing these conflicting considerations we are satisfied, notwithstanding our traditional reluctance to treat a container as a COGSA package, that the terms of the bill of lading should govern; if the bill of lading lists the container as a package and fails to describe objects that can reasonably be understood from the description as being packages, the container must be deemed a COGSA package. This rule not only accords with the 1968 Brussels Protocol, *supra,* but has the virtue of certainty. As we have noted, "only when the meaning of package is predictable will the parties concerned know when there is a need to place the risk of additional loss on one or the other accordingly." *Aluminios Pozuelo, Ltd. v. S.S. Navigator, supra,* 407 F.2d at 156.

When a bill of lading specifies the number of containers but does not reveal the number of packages inside, the only certain figure known to both parties is the number of containers being shipped. In such event the carrier cannot be charged with knowledge of whether the container is filled with packages, with unpackaged goods, or with some combination. The carrier should not be expected to assume the risk inherent in such uncertainty, facing liability that might vary by orders of magnitude depending on the exact packaging of goods inside a sealed container, even though this information was not revealed to it by the bill of lading.

We accordingly hold that, when the bill of lading does not clearly indicate an alternative number of packages, the container must be treated as a COGSA package if it is listed as a package on the bill of lading and if the parties have not specified that the shipment is one of

---

**10.** In *Marcraft Clothes, Inc. v. M/V "Kurobe Maru,"* 575 F.Supp. 239, 242–43 (S.D.N.Y.1983), on which Judge Sofaer relied, there was a clearer factual basis for holding each of 4,400 men's suits to be a package, since each was individually wrapped in plastic. It is not clear from that decision what figure was entered in the "pack-

ages" column of the bill of lading, although the description of goods was apparently simply "4,400 Sets of Men's Suits with Vest." *Id.* at 242. If the entry in the "packages" column was "1 container," (which we cannot determine from the decision), we would, absent further information, be inclined to disagree with the decision.

"goods not shipped in packages." Maximum damages in such a situation then are $500 per container, irrespective of the contents. Although this rule could drastically reduce the damages available to shippers in some situations, it does not depart from the principle that the limited liability clause in COGSA was designed to " 'set a reasonable figure below which the carrier should not be permitted to limit his liability,' " *Mitsui, supra,* 636 F.2d at 817 (quoting *Leather's Best, supra,* 451 F.2d at 815). It simply recognizes that within the constraints of the lower limit on liability set by COGSA, the allocation of risk in shipping is a matter governed by contract, and one best determined by the explicit agreement of the parties. The ability of the shipper and carrier to contract fairly for the division of liability between themselves depends in turn on disclosure of the relevant information about the packaging of the goods being shipped. The shipper retains the power to protect itself by stating in plain terms on the bill of lading the number of COGSA packages being shipped. Any other interpretation would prevent the carrier from accurately assessing its potential liability at the time it contracts to transport the goods.

We recognize that the rule established by us today, which will henceforth limit a carrier's liability under the same circumstances to $500 per container, resolves an uncertainty noted in earlier decisions (e.g., *Mitsui* and *Smythgreyhound* ) and that, in view of this uncertainty, the parties might have reasonably believed that the description of the number of plants on the bills of lading was sufficient to bring the shipment within the *Smythgreyhound* rule to the effect that a container whose contents are disclosed (there, however, in terms of pack-

ages) should not itself be treated as a package.[11] Accordingly, the rule we announce will not be applied retroactively but prospectively to bills of lading prepared after the date of this decision.

 With respect to the present case, since the plants described on the bills of lading clearly are not packages, they will be deemed to be "goods not shipped in packages" within the meaning of COGSA, which limits the carrier's liability in such a case to $500 per "customary freight unit," which is generally the unit on which the freight charge is based for the shipment at issue. *See General Motors Corp. v. Moore-McCormack Lines, Inc.,* 451 F.2d 24, 25–26 (2d Cir.1971) (per curiam); *Eaton Corp. v. S.S. "Galeona," * 474 F.Supp. 819, 823 (S.D.N.Y.1979); Edelman, *Cargo Claims and Limitation of Liability,* 17 Forum 719, 736 (1981). Nedlloyd argues that since it was paid a flat rate per container for shipping, regardless of use or weight, its liability should be limited to $500 per container. *See Croft & Scully Co. v. M/V Skulptor Vuchetich,* 664 F.2d 1277, 1282 (5th Cir.1982) (holding that a container was not a package, but remanding for a factual determination of whether it was the customary freight unit). However, the court below made no findings as to the customary freight unit in shipments of this sort and we are reluctant to do so in the first instance. *See Pullman-Standard v. Swint,* 456 U.S. 273, 291–92, 102 S.Ct. 1781, 1791–92, 72 L.Ed.2d 66 (1982).

 We therefore remand the case to the district court to determine what the customary freight unit is for a shipment of plants of this type and to award Binladen

**11.** Moreover, previous cases have held that the number entered in the packages column on the bill of lading is not itself determinative of the number of COGSA packages, *see, e.g., Solar Turbines Inc. v. S.S. "Al Shidadiah," * 575 F.Supp. 939, 942 (S.D.N.Y.1983) (declining to find the entry in the packages column on the bill of lading determinative of whether the trailer-enclosed generator was a package or a good not

shipped in packages); *General Motors Corp. v. S.S. Mormacoak,* 327 F.Supp. 666, 668 (S.D. N.Y.) (stating that the "fact that the bill of lading stated that the 'No. of Pkgs.' was 3 is not conclusive," and therefore holding that a 3 piece power plant constituted a good not shipped in packages), *aff'd on other grounds sub nom. General Motors v. Moore-McCormack Lines,* 451 F.2d 24 (2d Cir.1971).

damages in an amount up to $500 for each such unit.[12]

12. We find no merit in Binladen's various claims that Nedlloyd should be deprived of the benefit of COGSA's limited liability provision because of deficiencies in the bill of lading. Although Judge Sofaer did not reach this issue, we may rule on it here since it entails no factual findings outside the bill of lading, the terms of which are uncontested.

As Judge Sofaer recognized, the bill included a "U.S.A. CLAUSE" explicitly incorporating COGSA's provisions in international voyages involving U.S. ports. That same clause also clearly contemplated that COGSA provisions would supersede any conflicting provisions in the bill of lading. As such, the other, lower, liability limits stated in the bill of lading are void, 46 U.S.C. §§ 1303(8), 1304(5); *David Crystal, Inc. v. Cunard Steam-Ship Co., Ltd.,* 339 F.2d 295, 298 (2d Cir.1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965). However, the mere attempt to limit liability at a level lower than permitted by COGSA does not serve to strip a carrier of the COGSA limit. *See, e.g., Water-*

*mill Export, Inc. v. MV "Ponce," supra,* 506 F.Supp. at 615–16; *Sperry Rand Corp. v. Norddeutscher Lloyd, supra,* 1973 A.M.C. at 1399–1400.

In view of the incorporation of COGSA and the existence of a space on the front of the bill of lading providing an opportunity for the declaration of excess value, and even the inclusion of other, albeit invalid, liability limits, the shipper here cannot be heard to claim that it lacked notice of the prospect that its recovery per package would be limited. This case is quite different from *General Electric Co. v. M.V. Lady Sophie,* 458 F.Supp. 620, 622 (S.D.N.Y.1978), on which Binladen relies and in which the bill did not specifically refer to COGSA and did not provide a space for declaring the excess value of the goods shipped. Although it would certainly be helpful if Nedlloyd's bill of lading were more clearly laid out, we do not agree that any of the alleged infirmities stripped Nedlloyd of COGSA's $500 limit per package or customary freight unit.